ROTECH HEALTHCARE INC., Plaintiff,

v.

The UNITED STATES, Defendant.

No. 06–303 C.

United States Court of Federal Claims.

July 24, 2006.[1]

1. This opinion was issued under seal on June 30, 2006. Pursuant to ¶ 5 of the ordering language, the parties identified proprietary material subject to deletion on the basis that the material was protected/privileged. Brackets identify the material deleted.

David Hazelton, with whom were Joshua Chandler, David Palmer, and R. Kimbark Lee, Washington, D.C., for plaintiff.

Dawn Conrad, United States Department of Justice, with whom were Peter D. Keisler, Assistant Attorney General, David M. Cohen, Director, Todd M. Hughes, Assistant Director, Washington, D.C., for defendant.

## OPINION

BUSH, Judge.

Plaintiff Rotech Healthcare Inc. (Rotech), a Delaware corporation with its principal place of business in Orlando, Florida, filed this pre-award bid protest action on April 19, 2006. Rotech is the incumbent supplier of home oxygen equipment to the United States Department of Veterans Affairs (the VA). In this lawsuit, Rotech challenges the VA's decision to award four future contracts for that work to two competitor companies, Mitchell Home Medical, Inc. (Mitchell) and First Community Care, LLC (FCC). Rotech complains that the agency's decision to award the small business set-aside contracts to Mitchell and FCC is arbitrary and capricious. Plaintiff contends that Mitchell and FCC are ineligible for the set-aside awards because, although they are small businesses, they intend to fulfill the contracts by supplying home oxygen equipment obtained from large equipment manufacturers. Rotech argues that such a practice violates 15 U.S.C. § 637(a)(17) (2000), a section of the Small Business Act commonly referred to as the "non-manufacturer rule." Plaintiff asks the court to enjoin the VA from awarding the contracts to Mitchell and FCC, and to order it to conduct a new procurement which comports with the requirements of that rule.

The administrative record (AR) in this matter was filed on May 5, 2006. Now pending before the court are cross motions for judgment on the administrative record, filed by plaintiff and defendant on May 19, 2006. The motions have been fully briefed. The parties responded to the respective motions on June 2, 2006, and replied on June 9, 2006. Discovery was not requested by the parties. Oral argument was heard on June 12, 2006. For the reasons that follow, the court grants plaintiff's motion for judgment on the administrative record, and denies defendant's motion for judgment on the administrative record.

## BACKGROUND

This pre-award bid protest challenges the VA's conduct in relation to two Requests for Proposals (RFP) issued in 2005. To provide background and context for Rotech's claims, a brief history of each RFP is appropriate.

### I. Request for Proposals 583

#### A. Terms of the RFP

The VA issued Request for Proposals 583–00035–06 (RFP 583) on July 13, 2005. AR at 270. RFP 583 seeks the provision of home oxygen equipment for approximately 2247 patients who receive medical care in seven VA facilities in Illinois, Indiana, and Michigan. These areas are identified collectively as Veterans Integrated Services Network 11 (VISN 11). *Id.* at 270, 278–319. Although RFP 583 is structured as a small business set-aside cascaded procurement, with a three tier cascade structure, it provides that "*all* responsible business concerns (both small and large business concerns) are encouraged to submit proposals." *Id.* at 383 (emphasis in original). The RFP explains, however, that if a minimum of two offers are received from historically underutilized business zone (HUBZone) small business concerns, and the offers are determined to be competitive, to meet all solicitation requirements, and to represent the "best value" to the government, the VA reserves the right to make a HUBZone small business set-aside award. The RFP states further that, if no HUBZone award is made, the VA will determine whether a minimum of two offers have been received from other small business concerns and, subject to the same conditions, may make a small business set-aside award. Finally, if no award is made under any of the above conditions, the VA will make an award "on the basis of full and open competition from among *all* responsible business concerns (small and large business concerns)...." *Id.* at 384 (emphasis in original). The RFP also states that each of VISN 11's seven locations will be evaluated as a separate market.

RFP 583 also includes technical specifications that describe the type of work required

under the proposed contracts. Part I of the RFP describes "home oxygen services" as follows:

Contractor shall provide all supplies, materials, equipment, labor, supervision, management, and transportation in order to provide requested oxygen delivery systems. Home oxygen services include delivery of prescribed home oxygen equipment and supplies, equipment setup, orientation of contractor's services, equipment assessment, patient education/instruction, basic home safety review, and scheduling of ongoing deliveries and preventive maintenance inspection's [sic] (PMI) service appointments. These services also include pickup/removal of home oxygen equipment and supplies when home oxygen services are terminated. Provide firm fixed pricing for the equipment, supplies, and services per patient per month for the VA facility.

*Id.* at 276. The RFP also includes a 42–page "Schedule of Supplies/Services" which describes the specific items to be procured by the VA. That schedule is broken down into seven sections which correspond with the seven locations for which the supplies and services are being procured. *Id.* at 402–44. For each location, fourteen line items are listed and described. Blank boxes appear next to eleven of the items, in which offerors are to list their per unit costs and total costs. These items include:

ITEM A0001(a)—Rental concentrator with backup system consisting of compressed gas source, regulator, stand, (nasal cannula or mask and humidifier when specified). Concentrator will have flow rate capacity up to 5 LPM. E1390

ITEM A0001(b)—Rental concentrator with backup system consisting of compressed gas source, regulator, stand, (nasal cannula or mask and humidifier when specified). Concentrator will have flow rate capacity up to 10 LPM. E1390

ITEM A0002—Cylinder, size M or H *setup* consisting of regulator, flow meter, safety stand, humidifier and disposable

supplies (emergency backup system or as primary). E0431 [See Note 2 below]

ITEM A0003—Cylinder, size M or H refill (Backup/Primary). E0443

ITEM A0005—Cylinder, size "E" refill for Item A0004 above. Aluminum (or metal of equivalent weight or less) tanks required. E0443

ITEM A0006—Cylinder, size "D" (M15) refill for Item A0004 above. Aluminum (or metal of equivalent weight or less) tanks required. E0443

ITEM A0007—Cylinder, size "B" (M6) refill for Item A0004 above. Aluminum (or metal of equivalent weight or less) tanks required. E0443

ITEM A0008—Cylinder, size "C" (M9) refill for Item A0004 above. Aluminum (or metal of equivalent weight or less) tanks required. E0443

ITEM A0009—Demand Nasal Cannula (e.g. Oximyzer) Reservoir or pendant/equivalent. VA 111

ITEM A0010—Rental Demand Pulse Conserver Device; no less than 5:1 ratio or 60 ML/pulse. VA 111

ITEM A0012—Rental liquid oxygen system (90–100 lbs) stationary reservoir per patient. EO439; AND, Rental portable liquid oxygen system per patient. E0434.

ITEM A0013—Liquid oxygen per pound for portable liquid oxygen system under Item A0012. E0444.

*See, e.g., id.* at 402–06. For the remaining three line items, the price block is preprinted with the letters NC, which indicates that it is a "no cost" item. These include:

ITEM A0004—Portable system for *new set ups* consist of "E", "D", "B" (M6), or "C" (M9) size aluminum (or equivalent weight metal) cylinder with regulator, flow meter, handcart, pouch and disposable supplies. [See Note 4] [2]

ITEM A0011—Rental "E" cylinders (aluminum, each) complete portable system (e.g.tank, regulator, etc.) for ea[ch] VA facility for availability to issue home oxygen beneficiaries who deplete their porta-

---

**2.** Note 4 states that "Item # 4 (A0004, B0004, C0004, D0004, E0004, F0004, and G0004), Item # 11 (A0011, B0011, C0011, D0011, E0011, F0011, and G0011), and item # 14 (A0014, B0014, C0014, D0014, E0014, F0014, and G0014) are no-cost items." AR at 444.

ble units during appointments or to send home with new start-up (e.g. discharged from inpatient). [See Note 4]

ITEM A0014—Delivery for re-supply and/or relocation of equipment due to change in patient's residence. [See Note 4]

*Id.* Like all government procurements, RFP 583 has been assigned a North American Industrial Classification System (NAICS) code, which is listed on the RFP's cover sheet. NAICS codes are used by government agencies, and the United States Small Business Administration (SBA), to establish size standards governing which entities qualify as small businesses for preferences or eligibility under government programs and procurements. *See Advanced Sys. Tech., Inc. v. United States,* 69 Fed.Cl. 474, 475 n. 1 (2006) (citing 13 C.F.R. §§ 121.101, 121.402 (2006)). Here, the procurement bears NAICS code 532291, titled "Home Health Equipment Rental." AR at 270. This code indicates that small businesses which hope to secure a small business set-aside award under RFP 583 must have annual profits of no more than $6 million. *Id.* However, the RFP also includes the following provision, adopted from the Federal Acquisition Regulations (FAR):

> The NAICS code and small business size standard for this acquisition appear in Block 10 of the solicitation cover sheet (SF 1449). However, the small business size standard for a concern which submits an offer in its own name, but which proposes to furnish an item which it did not itself manufacture, is 500 employees.

*See id.;* 48 C.F.R. § 52.212–1(a) (2005).

## B. Procedural History

The VA received five eligible proposals in response to RFP 583. Because the conditions precedent to a HUBZone award were not met, the agency determined that an award could not be made under that tier of the cascaded procurement structure. Instead, the agency authorized small business set-aside awards for four of the locations covered by the RFP, and awards for the remaining three areas on the basis of full and open competition. None of those awards is to be made to Rotech, although plaintiff submitted proposals for each of the seven VA locations.

Plaintiff alleges that, on March 28, 2006, after Rotech discovered that the VA had begun to "phase-out" its incumbent contract for VISN 11, a company representative contacted Dannie Jennings, the VA's contracting officer (CO) for RFP 583. Mr. Jennings explained that the VA had begun to discontinue those services because it planned to award some of the work offered by RFP 583 to Mitchell and FCC. Plaintiff requested a debriefing regarding the planned awards, and confirmed the request, in writing, on March 29, 2006. Two days later, Mr. Jennings responded by letter faxed to plaintiff. Mr. Jennings stated that the VA would not provide a post-award debriefing to plaintiff, as no official award had been made, but that it would provide a "pre-award debriefing" regarding its plan to award contracts to Mitchell and FCC. AR at 452. The facsimile advised Rotech further that the VA planned to transition some of the work assigned to Rotech to those companies, "on a sole source basis based on unusual and compelling urgency, because of the need for meeting healthcare requirements." *Id.* Plaintiff claims that Mr. Jennings' "letter suggested that this claimed urgency was attributable to Rotech's supposed initial reluctance to continue work under" its incumbent contract. Compl. ¶ 14. Specifically, the March 31 st letter stated as follows:

> Other than obtaining the required phase-in, phase-out services under Contract No.: V553P–9126, we were led to believe that it would be fruitless to attempt to obtain any home oxygen services under subject contract (i.e., under either an open-market purchase order, or a contract extension, etc.), based on Rotech Healthcare Inc.'s initial reluctance to agree to extending subject through March 31, 2006. If this is not true, please let us know your position on the possibility of another contract extension.

AR at 452.

The next day, on April 1, 2006, the VA issued a "Preaward Notice" which announced that Mitchell would likely be awarded con-

tracts for two Michigan facilities (Areas B and C), and that FCC would likely be awarded contracts covering two Indiana facilities (Areas F and G), as small business set-asides. The notice letter also provided as follows:

> **Challenge of Small Business Size Status:** An offeror or another interested party may protest the small business representation of an offeror. To be timely, a protest must be received by the Contracting Officer by the close of business of the 5th business day after receipt of this preaward notice that identifies the apparently successful offeror. Please see FAR 19.302, Protesting a Small Business Representation, for additional information.

*Id.* at 455. Accordingly, on April 3, 2006, Rotech filed a small business size protest with the VA, arguing that an award to Mitchell or to FCC, without an adequate inquiry regarding those companies' intent to comply with the non-manufacturer rule, would be erroneous. In its size protest, Rotech stated as follows:

> Rotech urges an immediate inquiry into (1) the identity and size status of the manufacturers of the home oxygen equipment to be supplied by Mitchell and FCC, (2) the precise work to be performed by Mitchell and FCC under the contracts, and (3) the dollar value of the actual work to be performed by Mitchell and FCC. Because the VA apparently does not intend to perform such an inquiry, Rotech respectfully requests that this matter be referred for review by the U.S. Small Business Administration . . . .

*Id.* at 457. On the next day, plaintiff requested a debriefing from the VA regarding the sole source awards:

> Regarding the planned sole source awards, Rotech vigorously objects to the award of orders to Mitchell and FCC on other than a full and open basis. Rotech currently has a home oxygen contract with the VA for VISN 11 that was awarded based on a full and open competition. It is prepared to continue to perform in accordance with

that contract's terms. Under these circumstances, the VA appears to have no lawful basis for making sole source awards to Mitchell and FCC as indicated in your March 31 letter.

*Id.* at 472.

On April 11, 2006, Mr. Jennings told Rotech's counsel by telephone that he did not believe the non-manufacturer rule applied to RFP 583. Compl. ¶ 18. Two days later, the VA sent a pair of letters to Rotech. The first letter reconfirmed that the VA would not provide a debriefing regarding the Preaward Notice, as no official award had been made under RFP 583. AR at 474. The letter also acknowledged plaintiff's willingness to continue to supply home oxygen equipment to patients residing in VISN 11. The letter explained the agency's hope that Rotech would continue to provide home oxygen services to its existing patients, through a short-term agreement similar to Rotech's incumbent contract. It stated, however, that the VA intended to proceed with sole source awards to Mitchell and FCC, which would be used to obtain equipment for new patients. *Id.* at 475. The VA's second letter denied Rotech's size protest on the ground that it was not timely filed, because it was essentially a challenge to the terms of RFP 583 which should have been filed before the deadline for receipt of proposals. *Id.* at 476. It also reiterated the VA's opinion that RFP 583 was not subject to the non-manufacturer rule, because it addressed a procurement for services rather than manufactured products.

Rotech responded to the letters on April 17, 2006. Plaintiff argued again that the non-manufacturer rule applied to RFP 583, because the value of the contracts to be awarded was derived overwhelmingly from the acquisition of equipment, rather than services. Rotech also disagreed with the VA's finding that its size protest was untimely. Finally, plaintiff requested a copy of the agency's written justification and approval for the sole source awards to Mitchell and FCC, as required by the FAR.[3] *Id.* at 480 (citing 48 C.F.R. § 6.305(a) (2005)).

---

**3.** Although Rotech initially contested the validity of the planned sole source awards to Mitchell and FCC, plaintiff no longer challenges those awards. Accordingly, the VA's plan to utilize sole source contracts will not be addressed in this opinion.

## II. Request for Proposals 247

### A. Terms of the RFP

The second solicitation challenged by Rotech, Request for Proposals 247–0082–06 (RFP 247), was issued by the VA on December 19, 2005. RFP 247 seeks proposals on a contract to supply home oxygen equipment to VA beneficiaries in and around Augusta, Georgia. While many terms of RFP 247 are identical to those included in RFP 583, RFP 247 is structured differently. Initially, work under RFP 247 was designated a 100% small business set-aside. AR at 8. On March 16, 2006, however, the solicitation was amended, to provide that the contract would be awarded through a six tier cascaded procurement:

 a. Service Disabled Veteran Owned Small Business Participation

 b. HUBZone/8(a) Small Business Participation

 c. 8(a) Small Business Participation

 d. HUBZone Small Business Participation

 e. Small Business Set–Aside Participation

 f. Full and Open Competition

*Id.* at 92–93. The amendment explained that, at each of these tiers, the VA was to determine whether a minimum of two competitive offers were received from offerors which "provide the best value in accordance with the solicitation requirements and [whose] offers are otherwise determined responsible and eligible to receive an award." *Id.* On March 27, 2006, the VA amended RFP 247 a second time, and the 100% set-aside for small business concerns was reinstated. *Id.* at 96. RFP 247 has been assigned NAICS code 621610, titled "Home Health Care Services." *Id.* at 8. That code indicates that, to qualify as a small business, an offeror must have annual revenues of no more than $11.5 million. Like RFP 583, however, the solicitation incorporates the language of 48 C.F.R. § 52.212–1, which states as follows:

> NAICS code and small business size standard for this acquisition appear in Block 10 of the solicitation cover sheet (SF 1449).

However, the small business size standard for a concern which submits an offer in its own name, but which proposes to furnish an item which it did not itself manufacture, is 500 employees.

*See id.*

### B. Procedural History

Unlike RFP 583, no Preaward Notice has been issued in relation to RFP 247. In fact, proposals in response to the solicitation were not due until May 18, 2006, several weeks after this lawsuit was filed. *See id.* at 97. Rotech's protest in regard to RFP 247 is based on its belief that the VA will also refuse to apply the non-manufacturer rule to the procurement, but will nonetheless award the contract through a small business set-aside. The administrative record demonstrates that plaintiff has taken a number of steps to address this concern with the agency. Plaintiff alleges that on March 22, 2006, a Rotech representative telephoned Faye S. Thomas, the VA's contracting officer for RFP 247, and stated Rotech's belief that the non-manufacturer rule applied to the procurement. Compl. ¶ 40. Later that day, plaintiff faxed to Ms. Thomas a copy of Rotech's filings before the GAO, on a related matter, which discussed the non-manufacturer rule in more detail. *Id.* ¶ 41. On March 31, 2006, after learning that the VA had amended RFP 247 to reinstate the 100% set-aside for small business concerns, Rotech faxed another letter to Ms. Thomas which elaborated on its belief that the non-manufacturer rule applied to RFP 247.[4] *See* AR at 98. On April 17, 2006, Rotech's representative spoke with Ms. Thomas by telephone, and Ms. Thomas stated that the VA did not intend to apply the rule to RFP 247. Compl. ¶ 44. On the next day, the VA extended the deadline for submission of initial proposals under RFP 247 until May 18, 2006. AR at 97. Plaintiff filed this protest on April 19, 2006.

## DISCUSSION

### I. Jurisdiction

This is a pre-award bid protest action. There is no question that the Tucker Act, as

---

4. The letter is dated March 23, 2006. AR at 98. Plaintiff states in the complaint, however, that the letter was faxed to Ms. Thomas on March 31, 2006. *See* Compl. ¶ 43 and Exhibit J.

amended by the Administrative Dispute Resolution Act of 1996 (ADRA), Pub.L. No. 104–320, §§ 12(a), 12(b), 110 Stat. 3870, 3874–75 (1996), provides the United States Court of Federal Claims with bid protest jurisdiction in actions filed after December 31, 1996. 28 U.S.C. § 1491(b)(1)-(4) (2000); *Asia Pac. Airlines v. United States,* 68 Fed.Cl. 8, 16 (2005); *ViroMed Labs., Inc. v. United States,* 62 Fed.Cl. 206, 211 (2004); *see also Am. Fed'n of Gov't Employees, AFL–CIO v. United States,* 258 F.3d 1294, 1300 (Fed.Cir.2001); *Hunt Bldg. Co. v. United States,* 61 Fed.Cl. 243, 268–69 (2004). The statute explicitly provides that this court "shall have jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1); *see Asia Pacific,* 68 Fed.Cl. at 16; *Hunt Building,* 61 Fed.Cl. at 269 (both quoting 28 U.S.C. § 1491(b)(1)). "This statute further provides that the Court of Federal Claims 'shall have jurisdiction to entertain such an action without regard to whether suit is instituted before or after the contract is awarded.'" *Asia Pacific,* 68 Fed.Cl. at 16 (quoting 28 U.S.C. § 1491(b)(1)). Accordingly, this court has subject matter jurisdiction to adjudicate Rotech's pre-award bid protest. *See id.*

## II. Standard of Review

### A. Judgment on the Administrative Record

Rotech and the VA have filed cross motions for judgment on the administrative record, under Rule 56.1 of the Rules of the United States Court of Federal Claims (RCFC).[5] The standard for evaluating such motions is similar, but not identical, to that used to decide a motion for summary judgment under RCFC 56. *Hawkins v. United States,* 68 Fed.Cl. 74, 81 (2005) (citing *Bannum, Inc. v. United States,* 404 F.3d 1346, 1355 (Fed.Cir.2005)). It is beyond cavil that, on a traditional motion for summary judgment, the court must inquire whether the moving party has proved its case as a matter of fact and law, or whether a genuine issue of material fact precludes judgment. *See id.* (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). A Rule 56.1 motion, by contrast, calls for a more narrow review of whether, given the disputed and undisputed facts, the plaintiff has met its burden to show that a challenged decision was not in accordance with the law. *Id.; see also Bannum,* 404 F.3d at 1357 (instructing the court to make "factual findings under RCFC 56.1 from the [limited] record evidence as if it were conducting a trial on the record"). "[T]wo principles commonly associated with summary judgment motions that—the existence of a genuine issue of material fact precludes a grant of summary judgment and that inferences be weighed in favor of the non-moving party ... are inapplicable to a motion for judgment on the administrative record under RCFC 56.1." *Int'l Outsourcing Servs., L.L.C. v. United States,* 69 Fed.Cl. 40, 45 (2005) (citing *Bannum,* 404 F.3d at 1356–57). In other words,

> under RCFC 56.1, the existence of a fact question neither precludes the granting of a motion for judgment nor requires this

**5.** RCFC 56. 1, titled "Review of Decision on the Basis of Administrative Record," was abrogated by the Court of Federal Claims on June 20, 2006, and replaced by the new Rule 52.1(b) of the Rules of the United States Court of Federal Claims. Rule 52.1(b) is titled "Motions Respecting the Administrative Record." The new rule provides that "[t]he parties may move for partial or other judgment on the administrative record filed with the court. Absent an order by the court setting a different procedure, in any such motion or supporting memorandum, the moving or cross-moving party shall include a Statement of Facts that draws upon and cites to the portions of the administrative record that bear on the issues presented to the court. The opposing party shall include in any response a Counter-Statement of Facts that similarly draws upon and cites to the administrative record." RCFC 52.1(b). The Notice of Adoption of Amendments to Rules, also issued by the court on June 20, 2006, states that "[t]he amendments shall be effective June 20, 2006, and shall apply to pending proceedings as the court may order." *See* Notice of Adoption of Amendments to Rules, http://www.uscfc.uscourts.gov/announce.htm (last visited June 30, 2006). Because the motions considered herein were briefed in accordance with former Rule 56. 1, the court's opinion will rely on that prior version of the rule.

court to conduct a full blown evidentiary proceeding. Rather, such fact questions must be resolved by reference to the administrative record, as properly supplemented—in the words of the Federal Circuit, "as if [this court] were conducting a trial on [that] record."

*Id.* (quoting *Bannum,* 404 F.3d at 1357); *see also Carlisle v. United States,* 66 Fed.Cl. 627, 630–31 (2005); *Doe v. United States,* 66 Fed. Cl. 165, 174 (2005).

## B. Bid Protest Review

■■■■ It is well settled that "this court's review of an agency's decision regarding a contractual solicitation or award takes place in accord with standards set forth in the Administrative Procedure Act, 5 U.S.C. § 706." *Asia Pacific,* 68 Fed.Cl. at 19; *ViroMed Laboratories,* 62 Fed.Cl. at 211; *see also* 28 U.S.C. § 1491(b)(4) (2000) ("In any action under this [bid protest] subsection, the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5."); *Bannum,* 404 F.3d at 1351 (stating that "the trial court [first] determines whether ... the government's conduct fails the APA review under 5 U.S.C. § 706(2)(A)"). Accordingly, the court must determine whether the contracting agency's action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *See* 5 U.S.C. § 706(2)(A) (2000); *Bannum,* 404 F.3d at 1351; *Advanced Data Concepts, Inc. v. United States,* 216 F.3d 1054, 1057 (Fed.Cir.2000) ("The § 706(2)(A) 'arbitrary and capricious' standard applies to bid protests under 28 U.S.C. § 1491(b)(4) reviewed in the absence of [an agency-level appellate] hearing."). The plaintiff bears the burden of proving the arbitrary and capricious nature of the award, by a preponderance of the evidence. *See Grumman Data Sys. Corp. v. Dalton,* 88 F.3d 990, 995 (Fed. Cir.1996); *Hunt Building,* 61 Fed.Cl. at 269. "Under an arbitrary or capricious standard, the reviewing court should not substitute its judgment for that of the agency, but should review the basis for the agency decision to determine if it was legally permissible, reasonable, and supported by the facts." *ViroMed Laboratories,* 62 Fed.Cl. at 212 (citing *Motor Vehicle Mfrs. Ass'n of the United States v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983)). The court should overturn the challenged decision "only where '(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure.'" *Banknote Corp. of Am. v. United States,* 365 F.3d 1345, 1351 (Fed.Cir.2004); *Asia Pacific,* 68 Fed.Cl. at 19 (both quoting *Impresa Construzioni Geom. Domenico Garufi v. United States,* 238 F.3d 1324, 1332 (Fed.Cir.2001)); *see also Hunt Building,* 61 Fed.Cl. at 269. Essentially,

> [w]hen a challenge is brought on the first ground, the test is whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion, and the disappointed bidder bears a "heavy burden" of showing that the award decision had no rational basis. When a challenge is brought on the second ground, the disappointed bidder must show a clear and prejudicial violation of applicable statutes or regulations.

*Banknote,* 365 F.3d at 1351 (internal quotations and citations omitted).

If it is determined that a contract was awarded in violation of APA standards, the court must then evaluate whether the plaintiff, as an unsuccessful bidder, was prejudiced significantly by the government's conduct. *Bannum,* 404 F.3d at 1353. To do so, the court is required "to make factual findings [under RCFC 56.1] from the record evidence as if it were conducting a trial on the record." *Id.* at 1357. Plaintiff again bears the burden of proof, and "must show that there was a substantial chance [plaintiff] would have received the contract award but for the [government's] errors...." *Id.* (internal quotations omitted).

## C. Permanent Injunction

■■■ In its complaint, Rotech requests a permanent injunction ordering the VA to apply the non-manufacturer rule to its pending award decisions under RFPs 583 and 247. Plaintiff also agrees, however, that an order to the VA to cancel the planned awards to Mitchell and to FCC, and to resolicit the contracts in a manner which complies with

the non-manufacturer rule, would be an appropriate remedy in this instance. "In deciding whether a permanent injunction should issue, a court considers: (1) whether, as it must, the plaintiff has succeeded on the merits of the case; (2) whether the plaintiff will suffer irreparable harm if the court withholds injunctive relief; (3) whether the balance of hardships to the respective parties favors the grant of injunctive relief; and (4) whether it is in the public interest to grant injunctive relief." *PGBA, LLC v. United States*, 389 F.3d 1219, 1228–29 (Fed.Cir.2004) (citing *Amoco Prod. Co. v. Vill. of Gambell, Alaska*, 480 U.S. 531, 546 n. 12, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987)); *KSEND v. United States*, 69 Fed.Cl. 103, 113 (2005). "The test for a permanent injunction is almost identical to that for a temporary restraining order or preliminary injunction, but rather than the likelihood of success on the merits, a permanent injunction requires actual success on the merits." *KSEND*, 69 Fed. Cl. at 113.

### D. Standing

■ It is well settled that, to prevail in a bid protest, a claimant must provide evidence of "not only a significant error in the procurement process, but also that the error prejudiced it." *Galen Med. Assocs., Inc. v. United States*, 369 F.3d 1324, 1330 (Fed.Cir. 2004) (quoting *Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1562 (Fed.Cir.1996)). This requires evidence of a "substantial chance" that the protestor would have received the contract award, but for the alleged error. *Id.* at 1331; *see also Emery Worldwide Airlines, Inc. v. United States*, 264 F.3d 1071, 1086 (Fed.Cir.2001) ("To establish prejudice in an action involving an alleged statutory or regulatory violation, a protester must show that absent the error, there was a substantial chance it would have received the contract award.") (internal quotation omitted). The law is clear that issues of harm and prejudice must be examined at the outset of any bid protest litigation, as they are essential to the plaintiff's standing, and thus, the court's jurisdiction. *See Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed.Cir.2003) (holding that an inquiry into the prejudice suffered by a protestor, as a result of an error in the procurement process, must be examined prior to a review of the merits of its protest).

■ Here, the United States agrees, in the main, that if Rotech succeeds in showing that the VA's decision to make small business set-aside awards was in error, it will also be able to establish harm as a result of that error. Defendant disagrees with Rotech's allegation of harm, however, in regard to three of the VA locations (areas A, D, and E) for which the VA plans to award contracts under RFP 583. The government argues that the non-manufacturer rule, and any offerors' purported failure to comply with it, are irrelevant to the VA's award decisions for those areas, which were evaluated on the basis of full and open competition. Def.'s Resp. at 18. The government claims that "Rotech cannot demonstrate that it was harmed in any way by the VA's failure to apply the nonmanufacturer rule to source selection decisions for locations A, D, and E, because as a large business, its proposal was considered for these locations just like the proposals submitted by small businesses." *Id.* at 19. Defendant concedes that Mitchell and FCC failed to include required representations in their proposals regarding compliance with the non-manufacturer rule. Defendant also agrees that this mistake would have disqualified those companies from consideration under the small business set-aside tier of the procurement. The United States insists, however, that Mitchell and FCC nevertheless would have been eligible to compete during the third tier of the competition, and thus, would still be in line for awards in areas A, D, and E. Accordingly, the government contends that, even if Rotech succeeds on the merits of its claim regarding the non-manufacturer rule, the court should order a resolicitation only for the four locations for which Mitchell and FCC were chosen to receive small business set-aside awards.

For its part, Rotech argues that it was harmed in relation to all seven of the areas addressed in RFP 583. Rotech insists that, if the VA had applied the non-manufacturer rule during the small business tier of the cascaded procurement, it would have discovered that Mitchell and FCC had failed to

make required representations regarding their intent to comply with non-manufacturer rule, and thus, the VA would have disqualified them from competition outright. And, plaintiff contends, because Rotech received the highest score of all the remaining offerors, it then would have won those three awards during full and open competition.

On this aspect of the record, the court agrees with defendant. There is no evidence to suggest that, because Mitchell and FCC failed to make required representations relevant to their small business status, those companies should have been disqualified from competition under RFP 583 altogether. It is clear that both companies did, in fact, fail to represent that they would comply with the non-manufacturer rule. And plaintiff is correct that other offerors' proposals were excluded from competition under RFP 583 for failure to make other types of required representations.[6] *See, e.g.,* AR at 1763, 1765, 1767, 1772. Indeed, the RFP itself states that "[o]ffers that fail to furnish required representations and information, or reject the terms and conditions of the solicitation, may be excluded from consideration." *Id.* at 275. The plain language of that provision, however, indicates that disqualification of an offending offeror is left to the discretion of the VA. It follows, then, that the standard set forth in the RFP permitted, but did not require, the VA to eliminate Mitchell and FCC from competition for small business set-aside awards under RFP 583 based on their failure to make required representations, and as demonstrated by the court's examination of the instances and circumstances under which the CO eliminated defective offers, the CO did not abuse this discretion. The RFP likewise did not require the agency to disqualify Mitchell and FCC from full and open competition. [ ].[7] *See generally* Compl.; AR at 2051–52. Accordingly, it would be inappropriate for the court to examine the basis for that decision.

For these reasons, the court concludes that Rotech has not established harm, and therefore does not have standing, to challenge the VA's award decisions for work in areas A, D, and E offered by RFP 583. However, because the parties agree that Rotech has standing to challenge the award decisions related to the other four areas, the court will consider the merits of Rotech's protest.

## III. Merits

### A. Timeliness

#### 1. Challenge to the Terms of RFP 583

Before addressing Rotech's substantive claims, the court must examine several arguments by defendant which challenge the timeliness of Rotech's protest. The United States argues first that Rotech's argument regarding the non-manufacturer rule is essentially a challenge to the terms of RFP 583, and so, it should have been made before the January 2006 deadline for submission of proposals. Because the claim was not made before that date, defendant claims that it is now time-barred. Relying primarily on this court's opinion in *North Carolina Division of*

---

6. These omissions by other offerors are easily distinguished from the circumstances here. The record establishes that three companies which submitted proposals in response to RFP 583, [ ], failed altogether to make any of the required representations set forth in RFP 583. AR at 1763, 1765, 1767. The required representations, which were adopted from FAR § 52.212–3, titled "Offeror Representations and Certifications—Commercial Items," were listed on pages 6–6 through 6–12 of the solicitation. The required representations addressed a broad range of subjects, including but not limited to a offeror's Taxpayer Identification Number and its Affirmative Action Compliance. *See* 48 C.F.R. § 52.212–3; AR at 375–81. It is clear that those representations were not solely relevant to the companies' ability to compete under a particular tier of the procurement, but rather, pertained to their overall ability to qualify for award of a government contract. A fourth offeror, [ ], was disqualified from competition because it failed to submit a subcontracting plan. *Id.* at 1771–72. That requirement applied to all large businesses which submitted proposals in response to RFP 583. *Id.* Again, unlike Mitchell and FCC's failure to represent that they would comply with the non-manufacturer rule, that failure cannot be said to have merely affected [ ] ability to compete under one tier of the procurement but not another. Indeed, as a large business, [ ] was eligible to compete under the full and open competition tier of the procurement only, and so, its failure necessarily disqualified it from the procurement altogether.

7. [ ].

*Services for the Blind v. United States,* 53 Fed.Cl. 147 (2002), defendant argues that "deficiencies or defects that are apparent from the face of the solicitation should be raised before offers are submitted, or [they] are waived ..." Def.'s Mot. at 8. The government contends that

> it was clear from the face of the solicitation that the VA considered the procurement to be one for services ... any challenge to the VA's classification of RFP 583 as a service contract should have been brought before the proposal deadline of January 25, 2006. Therefore, Rotech's challenge to the clear terms of the solicitation is untimely and should be dismissed by this court.

*Id.* at 10. In support, defendant highlights RFP 583's description of the procurement as one for "VISN 11 Home Oxygen Services"; the RFP's description of its Schedule of Supplies/Services, which states that "a contractor shall provide home oxygen *services* ..."; Attachment 5 to the RFP, which includes the United States Department of Labor's Service Contract Wage Determination Information; and the fact that the RFP was assigned NAICS code 532291, titled "Home Health Equipment Rental," which defendant insists is a "service code." *Id.* at 9. The government admits that RFP 583 contains language adopted from FAR § 52.212-1, which provides an alternative size standard applicable to non-manufacturers, and is typically used in conjunction with contracts for supplies. *See* 48 C.F.R. § 52.212-1(a). Defendant argues, however, that the inclusion of the language from § 52.212-1, when contrasted with those service-type terms, at most created a patent ambiguity in the RFP which should have been brought to the government's attention before the proposal deadline. The United States also claims that, in previous dealings with Rotech regarding RFP 583, the VA did not indicate that it would apply the non-manufacturer rule, and so, if plaintiff was unsure about the rule's application, it should have raised that concern prior to proposal submission.

Rotech disagrees with the contention that this protest challenges the terms of RFP 583. In fact, plaintiff contends that the portions of the RFP cited by defendant are irrelevant to its protest, because the essential question is not whether the contract was designated by the VA as one for services, but instead, whether the terms of the RFP made clear that the agency would not apply the non-manufacturer rule to it. Rotech claims that RFP 583's terms actually support the application of the rule, and so, the company had no cause to protest until the VA made it clear that the agency would not apply the rule. Plaintiff further contends that it has, in fact, complied with the relevant deadlines. Plaintiff points out that Rotech first raised the issue of the non-manufacturer rule in the context of a pre-proposal bid protest brought before the United States Government Accountability Office (GAO) by another company, and that it filed this suit less than one week after the VA rejected its size protest. *Id.* at 13–14 & n. 9.

 Defendant is certainly correct that, according to a settled timeliness rule utilized by the GAO, protests based upon alleged improprieties in a solicitation which are apparent before the deadline for receipt of initial proposals must be filed in advance of that deadline. 4 C.F.R. § 21.2(a)(1) (2006) ("Protests based upon alleged improprieties in a solicitation which are apparent prior to bid opening or the time set for initial proposals shall be filed prior to bid opening or the time set for initial proposals."). The Court of Federal Claims has indeed adopted that rule in some circumstances. *See, e.g., ABF Freight Sys., Inc. v. United States,* 55 Fed.Cl. 392, 399 (2003); *North Carolina,* 53 Fed.Cl. at 165. However, while the rule is undoubtedly useful in some circumstances, it is not binding on the court.[8] *See Consolidated Eng'g Servs., Inc. v. United States,* 64 Fed.Cl. 617, 624 (2005) (*CESI*); *ABF Freight System,* 55

---

8. Similarly, "[w]hile [GAO] decisions are not binding on this court, this court accords deference to the Comptroller General decisions in recognition of GAO's expertise and role in the resolution of contested procurement decisions." *North Carolina,* 53 Fed.Cl. at 165 n. 13 (citing

*Bean Dredging Corp. v. United States,* 22 Cl.Ct. 519, 522 (1991)) (citing *Honeywell, Inc. v. United States,* 870 F.2d 644, 647–48 (Fed.Cir.1989); *Howell Constr., Inc. v. United States,* 12 Cl.Ct. 450, 452 (1987)).

Fed.Cl. at 399; *Allied Tech. Group, Inc. v. United States,* 39 Fed.Cl. 125, 146 (1997); *Aerolease Long Beach v. United States,* 31 Fed.Cl. 342, 358 (declining to accept GAO rule as controlling all cases and stating that "[i]f the offeror declines to challenge the problem, the reviewing tribunal *may* find that the offeror waived its right to protest") (emphasis added), *aff'd,* 39 F.3d 1198 (1994). Instead, the rule is to be applied in "appropriate circumstances," in which, for example, a plaintiff has acted in a manner which would be "disruptive, unfair to the other offerors [or] would serve to undermine the soundness of the federal procurement system." *North Carolina,* 53 Fed.Cl. at 165 (citing *Pardee Constr. Co.,* B–256,414, 94–1 CPD ¶ 372, at *4, 1994 WL 269819 (June 13, 1994) (unpublished) (stating that GAO's "timeliness rules reflect the dual requirements of giving parties a fair opportunity to present their cases and resolving protests expeditiously without unduly disrupting or delaying the procurement process")); *see also CESI,* 64 Fed.Cl. at 624 (stating that the court "may impose GAO timeliness rules in their entirety or as general guidelines if [it] deem[s] the facts on record warrant such treatment"); *ABF Freight,* 55 Fed.Cl. at 399. The court, unlike GAO, must be particularly careful to apply the rule in *exceptional circumstances only,* given its tension with Congress' express grant of jurisdiction to entertain bid protests filed both before and after contract award. *See ABF Freight System,* 55 Fed.Cl. at 399 (citing 28 U.S.C. § 1491(b)).

Here, it is arguably true that some portions of RFP 583 indicate the VA's belief that the solicitation is one for services. The opposite can be said, however, for other sections which appear to describe a supply contract. Most obviously, fourteen of the fifteen line items listed in RFP 583 identify manufactured goods to be procured by the VA. *See, e.g.,* AR at 402–06. Indeed, the Schedule of Supplies/Services, which is perhaps the most *prominent portion of the entire document,* is dedicated almost entirely to describing manufactured items. *See id.* RFP 583 also includes a standard clause adopted from FAR § 52.219–6, which is used to implement the regulatory version of the non-manufacturer rule. That provision states, in relevant part,

that "[a] small business concern submitting an offer in its own name shall furnish, in performing the contract, only end items manufactured or produced by small business concerns in the United States or its outlying areas." *See* AR at 348–50; 48 C.F.R. § 52.219–6(c) (2005). And, as defendant concedes, the text also includes the small business size standard applicable to procurements for manufactured items, which is used any time the non-manufacturer rule applies to a procurement. *See* AR at 270 (citing FAR § 52.212–1(a)). The government has presented a complicated argument, which will be addressed later, to show that this particular language was included in the RFP as a matter of course, but was not technically operative in this case. Even assuming that premise to be correct, however, the court does not agree that inclusion of the provision was so obviously ineffectual that it created a "patent" ambiguity which Rotech should have recognized and brought to the VA's attention before proposal submission.

█ It is true that, any time an ambiguity exists in a solicitation, "the issue becomes whether the disputed provisions were patently ambiguous . . . ." *Maint. Eng'rs, Inc. v. United States,* 21 Cl.Ct. 553, 559 (1990). If the terms of a solicitation are patently ambiguous, the non-drafting party has a duty to inquire as to their meaning. *Id.* (citing *Fort Vancouver Plywood Co. v. United States,* 860 F.2d 409, 414 (Fed.Cir.1988)). In such a case, "if differing constructions of the [solicitation's] plain meaning are plausible, the court must inquire whether such a discrepancy would be apparent to a reasonably prudent contractor." *Id.* (citing *John C. Grimberg Co., Inc. v. United States,* 7 Cl.Ct. 452, 456 (1985)). It is well settled, however, that contractors must inquire only as to major omissions, obvious discrepancies, or manifest conflicts in a solicitation's provisions. *Id.; see also WPC Enter., Inc. v. United States,* 163 Ct.Cl. 1, 323 F.2d 874, 877 (1963). Indeed, it is critical to recognize that a "patent ambiguity," by definition, is one which is " 'so glaring as to raise a duty to inquire.' " *Fort Vancouver Plywood,* 860 F.2d at 414 (quoting *United States v. Turner Constr. Co.,* 819 F.2d 283, 286 (Fed.Cir.1987)) (emphasis in

original); *Maintenance Engineers*, 21 Cl.Ct. at 560. Further, "it is not the contractor's actual knowledge, but the obviousness of the inconsistency that imposes the duty to inquire." *Maintenance Engineers*, 21 Cl.Ct. at 560 (citing *Chris Berg, Inc. v. United States*, 197 Ct.Cl. 503, 455 F.2d 1037, 1045 (1972)). Here, however, the purported ambiguity in RFP 583's language is in no way obvious. The linchpin of the government's theory, which is summarized in the next subsection of this opinion, captioned "Challenge to NAICS Codes," *infra*, is that RFP 583 includes some terms which have no actual effect. Even if that claim is correct, however, the court declines to hold that inclusion of those terms rendered RFP 583 patently ambiguous, or that Rotech had a duty to raise the ambiguity to the CO prior to submitting a proposal. The court declines to hold Rotech responsible for anticipating such a complex and counterintuitive interpretation of the FAR, at least at the pre-proposal phase of the procurement.

█ In sum, there is no question that several sections of RFP 583 raise the specter of a procurement for supplies, to which the non-manufacturer rule applies. No part of the RFP indicates, in any way, that the VA will not apply that rule. If, as the government suggests, some portions of RFP 583 conflicted with one another, the court concludes that the conflict created, at best, a latent ambiguity which must be construed against the government, as drafter, under the principle of *contra proferentem*. *See Turner Const. Co., Inc. v. United States*, 367 F.3d 1319, 1321 (Fed.Cir.2004) (stating that "[w]hen a dispute arises as to the interpretation of a contract and the contractor's interpretation of the contract is reasonable, [the court] appl[ies] the rule of *contra proferentem*, which requires that ambiguous or unclear terms that are subject to more than one reasonable interpretation be construed against the party who drafted the document"). Defendant's argument that Rotech should have been aware of the basis for this protest prior to the deadline for proposals, based on that latent defect, is untenable.

Further, even if the court agreed with the United States' argument, and were con-

strained to apply the GAO timeliness rule, a conclusion that Rotech's action is time-barred still would not be warranted. In *North Carolina*, the Court of Federal Claims explained that,

> where an offeror recognizes a significant deficiency or problem in a solicitation (*e.g.*, the erroneous application of a particular statute/regulation to the solicitation), the proper procedure for the offeror to follow is not to wait to see if it is the successful offeror before deciding whether to challenge the procurement, but rather to raise the objection in a timely fashion, *i.e.*, prior to the closing date for receipt of proposals or, *at the latest, prior to contract award*.

53 Fed.Cl. at 165 (emphasis added). Here, the record is uncontroverted that although the VA has issued a Preaward Notice under RFP 583, no award has been made. There is no question, then, that Rotech has complied with the standard announced in *North Carolina. See id.*

Moreover, the record makes clear that Rotech raised the issues central to this protest before the deadline for proposals in response to RFP 583. On September 20, 2005, Metro Home Medical Supply, Inc. (MHMS), a small business which intended to submit a proposal in response to RFP 583, filed a pre-award bid protest before the GAO which challenged the VA's procurement strategy. The parties agree that Rotech intervened in that action and argued that MHMS was ineligible for a small business preference because its proposal did not appear to comply with the non-manufacturer rule. *See* Def.'s SOF ¶¶ 19–20; Pl.'s Resp. at 13; AR at 2136–41. It may be true that, in the course of the intervention, plaintiff did not expressly challenge the VA's characterization of the contract as one for services rather than supplies, but it undoubtedly raised the issues at the center of this protest. And, as plaintiff correctly points out, there was no evidence, at that time, that the VA disagreed with Rotech's contentions regarding the non-manufacturer rule, which would have triggered plaintiff's duty to pursue the claim further. Similarly, after Rotech learned of the probable awards to Mitchell and FCC, it protested to VA and the SBA, arguing again that neither of those

companies intended to comply with the non-manufacturer rule. *See* AR at 456. Based on these repeated, good faith efforts to pursue the non-manufacturer issue with the VA and SBA prior to award, the court cannot conclude that Rotech acted in a manner which would be "disruptive, unfair to the other offerors [or] would serve to undermine the soundness of the federal procurement system." *North Carolina*, 53 Fed.Cl. at 165. Accordingly, the court declines to apply the GAO timeliness rule to conclude that plaintiff's protest is untimely.

### 2. Challenge to NAICS Codes

■ Defendant argues next that Rotech's protest is essentially an untimely challenge to the NAICS codes assigned to RFPs 583 and 247. As stated earlier, NAICS codes are used by government agencies and SBA to establish size standards governing which entities qualify as small businesses for preferences or eligibility under government programs and procurements. *See Advanced Systems Technology*, 69 Fed.Cl. at 475 n. 1. The United States Office of Management and Budget (OMB) assigns NAICS codes to various industry sectors, and SBA determines which firms qualify as small businesses in accordance with those codes, "to assure that a fair proportion of government contracts for goods and services are performed by such entities in each industry category." *Id.* at 476 (citing 15 U.S.C. §§ 637(b)(6), 644(a) (2000)). To do so, SBA specifies the maximum number of employees, or the maximum annual receipts, which a company may have in order to qualify as a small business within a particular code. *Id.* (citing 13 C.F.R. § 121.201 (2006)); *see also United Enter. & Assocs. v. United States*, 70 Fed.Cl. 1, 7 n. 12 (2006). Then, according to SBA regulations, procuring agencies must specify the NAICS code and accompanying size standard applicable to each federal procurement in which small business status is required or pre-ferred. 13 C.F.R. § 121.401 (2006). The agency's contracting officer must select a NAICS code for each procurement no later than the date on which the solicitation is issued. 13 C.F.R. § 121.402(a). This is done by assigning to the procurement "the NAICS code which best describes the principal purpose of the product or service being acquired in a particular solicitation." *Id.* § 121.402(b). The NAICS code assigned to a procurement, and its corresponding size standard, are final unless appealed to the Small Business Administration.[9] *Id.* § 121.402(c); 48 C.F.R. § 19.303(c) (2005). A challenge to an agency's assignment of a particular NAICS code to a procurement must be served and filed on the SBA within ten calendar days after the solicitation is issued. 13 C.F.R. § 121.1103(b)(1) (2006). Such a challenge is an administrative remedy which must be exhausted before judicial review of a code designation is permitted. 13 C.F.R. § 121.1102 (2006).

Here, defendant argues that Rotech has attempted to challenge the NAICS codes assigned to RFPs 583 and 247, but that such claims are barred by the ten day deadline set forth in 13 C.F.R. § 121.1103. The government contends that both RFPs were assigned NAICS codes which are used only to describe services contracts, to which the non-manufacturer rule does not apply.[10] Defendant insists that the codes demonstrate the true nature of the contracts offered by the RFPs, because the VA selected the codes which best described the principal purpose of the product or service being acquired, based on " 'the relative value and importance of the components of the procurement making up the end item being procured....' " Def.'s Mot. at 18 (quoting 13 C.F.R. § 121.402(b)). The government posits that, if Rotech challenges the VA's failure to apply the non-manufacturer rule to the procurements, it must also be challenging the procurements' classification as ones for services. The United States then states that

---

**9.** A NAICS code may also be clarified, completed, or supplied by the SBA in connection with a formal size determination or size appeal. 13 C.F.R. § 121.402(d).

**10.** RFP 247 was assigned NAICS Code 621610, titled "Home Health Care Services." RFP 583 was assigned NAICS Code 532291, titled "Home Health Equipment Rental." The United States points out that NAICS Code 532291 is included in subsector 532 of the NAICS, which is described as "Rental and Leasing Services." *See* AR at 8, 270.

[i]f Rotech is challenging the VA's classification of RFP 583 and RFP 2[47] as service contracts, then it is really challenging the NAICS code selection for each RFP, neither of which was classified under a manufacturing NAICS code as is required with procurements for supplies. Rotech's challenge to the NAICS codes would be untimely. It is well past the 10-day deadline for challenging the NAICS code for either solicitation. Also, Rotech could not challenge the NAICS code in this Court until it had presented its appeal to the SBA–OHA, which is a mandatory administrative remedy that must be exhausted. *Id.* at 18. Defendant acknowledges that, in addition to its NAICS code, each RFP includes the language of FAR § 52.212–1, which sets forth an alternative size standard (500 employees) and states that it will supercede a solicitation's NAICS code size standard any time an offeror proposes to supply products which it did not itself manufacture. The government argues, however, that these alternative provisions have no effect on RFPs 583 and 247, and that their $6 million and $11.5 million standards still apply. The basis for that complicated argument is as follows: The United States argues first that the VA included the alternative size standard found in § 52.212–1 in the text of RFPs 583 and 247 only because FAR § 12.301 required it to do so. There is no question that FAR § 12.301(b)(1) mandates the inclusion of § 52.212–1 in every solicitation for "commercial items," including those for home oxygen equipment.[11] 48 C.F.R. § 12.301 (2005). Next, defendant points out that, under the FAR, the term "commercial item" is defined to include some types of services. Def.'s Reply at 14. Indeed, that term includes "[i]nstallation services, maintenance services, repair services, training services, and other services if—. . . [s]uch services are procured for support of an item. . . ." 48 C.F.R.

§ 2.101 (2005). Defendant reasons, therefore, that "although FAR § 52.212–1(a) is included in solicitations for commercial items, it does not necessarily apply to every solicitation." Def.'s Reply at 14 (citing *Size Appeal of Pride Int'l, LLC,* SBA No. 4648 (2004)). In other words, the government appears to allege that the alternative size standard does not apply to solicitations for commercial items which include services, because in such a case, an offeror will not supply manufactured items, but will supply manufactured items *and services.* The United States insists that here, RFPs 583 and 247 call for the provision of manufactured items—home oxygen equipment—but also call for services which accompany that equipment, such as installation, delivery and training, and so, FAR § 52.212–1 does not apply to them. Defendant argues that this analysis is supported by the fact that RFPs 583 and 247 were assigned NAICS codes which appear in special sectors of the Code's framework, and that these NAICS codes can never be displaced by the 500 employee alternative size standard found in § 52.212–1. The government concedes that the VA may have erred in failing to tailor the solicitations' language to reflect this technical and admittedly confusing application of § 52.212–1, but argues that this failure at most created a patent ambiguity which Rotech should have raised prior to submitting its proposal.

In support of its contentions, defendant relies on *Size Appeal of Pride Int'l, LLC,* SBA No. 4648 (2004). In that decision, the SBA's Office of Hearings and Appeals (SBA–OHA) rejected a plaintiff's argument that the non-manufacturer size standard applied to a procurement because FAR § 52.212–1 was included in its text. In so holding, the SBA stated that the clause applies in only very limited circumstances, and was inapplicable in that instance because the procurement did not call for the provision of manufactured

---

11. 48 C.F.R. § 12.301(b)(1) provides, in relevant part, as follows:
 (b) Insert the following provisions in solicitations for the acquisition of commercial items, and clauses in solicitations and contracts for the acquisition of commercial items:
 (1) The provision at 52.212–1, Instructions to Offerors–Commercial Items. This provision provides a single, streamlined set of instruc-

tions to be used when soliciting offers for commercial items and is incorporated in the solicitation by reference (*see* Block 27a, SF 1449). The contracting officer may tailor these instructions or provide additional instructions tailored to the specific acquisition in accordance with 12.302.
48 C.F.R. § 12.301(b)(1) (2005).

items. Defendant claims that the situation here is similar, and that, "[b]ecause the non-manufacturer rule does not apply to NAICS codes 621610 or 532291, the inclusion of FAR § 52.212–1(a) in both solicitations" was ineffectual. *See* Def.'s Reply at 16. Then, based on its interpretation of the FAR, the government posits that, if Rotech believes that the non-manufacturer rule and accompanying 500 person size standard do, in fact, apply to RFPs 583 and 247, plaintiff must also believe the NAICS code designations to be in error. Defendant insists, therefore, that Rotech should have challenged those codes within ten days of issuance. In essence, defendant contends that

> the NAICS code and the nonmanufacturer rule (if they conflict) are inextricably linked—if a size standard other than the nonmanufacturer size standard is chosen for the procurement and that size standard is not in subsectors 42–45 of the NAICS (where the NAICS code size standard may be set aside if the procurement is for supplies)—then the NAICS code must be appealed in order to apply the nonmanufacturer rule.

*Id.* at 19. Finally, the government notes that, in separate size protests filed in relation to RFP 583, the SBA has consistently applied the $6 million size standard associated with NAICS code 532291, rather than the 500 employee size standard applicable to non-manufacturers. The government claims that "[t]hese determinations are evidence that even the SBA does not find the nonmanufacturer rule applicable to RFP 583 because if it did, it would have to determine whether FCC met the size standard of 500 employees." *Id.* at 20.

In response, Rotech insists that its protest does not challenge the NAICS codes assigned to RFPs 583 and 247. In fact, plaintiff states that the choice of codes is irrelevant:

> 15 U.S.C. § 637(a)(17)(B)(iv) makes no mention of the classification "code" when imposing the requirement that a small business offeror "represent that it will supply the product of a domestic small business manufacturer or processor." Instead, [t]he issue of the "code" is discussed in a

separate section of the statutory Nonmanufacturer Rule that relates to an issue entirely distinct from the identity of the product's manufacturer. Under 15 U.S.C. § 637(a)(17)(B)(ii[ ]), the offeror must "be a small business concern under the numerical size standard for the Standard Industrial Classification Code assigned to the contract solicitation on which the offer is being made." In its NAI[CS] code argument, the VA seems to have confused these two separate and distinct provisions of 15 U.S.C. § 637(a)(17)(B).

Pl.'s Mot. at 22. Rotech contends that the non-manufacturer rule, and FAR § 52.212–1(a) "expressly *supersede*[ ] the NAICS code with a different size standard for offerors offering products they do not manufacture themselves. As a result, the Nonmanufacturer Rule issue (and this protest) are clearly separate from the issue of what code the agency assigns to these procurements as an initial matter." Pl.'s Resp. at 25 (emphasis in original). Plaintiff also points out that the United States has cited no case in which a challenge based on the non-manufacturer rule was dismissed by the SBA based on a contractor's failure to challenge an agency's code choice. In fact, plaintiff claims that the decisions show just the opposite. In *Size Appeal of Empire Home Medical, Inc.*, SBA No. 4291 (1998), for example, the SBA–OHA concluded that the non-manufacturer rule did not apply to a procurement, because it was one for services, even though the NAICS code assigned to it by the agency was one designated for manufactured goods. In that decision, the SBA did not state that a challenge to that inconsistent NAICS code was a prerequisite to suit.

There is no question that this protest may require the court to examine, among other things, the NAICS codes assigned to RFPs 583 and 247. The court agrees with plaintiff, however, that this lawsuit is not tantamount to a challenge of those codes. First, the plain language and structure of 15 U.S.C. § 637, and the underlying purpose of the NAICS code system, suggest otherwise. As Rotech correctly notes, defendant's argument seeks to create an inter-relationship between two distinct sections of the statute, and two

distinct requirements which small business offerors must satisfy before they are eligible for a small business set-aside award. The government has not, however, articulated a logically persuasive interrelationship, nor directed the court to any persuasive authority to show that such a connection exists. The first provision on which the United States relies, § 637(a)(17)(B)(ii) of the Small Business Act, requires that, to qualify for a small business preference, an offeror must meet the numerical size standard applicable to the procurement, as identified by its code assignment. 15 U.S.C. § 637(a)(17)(B)(ii). A challenge pursuant to that provision allows a plaintiff to dispute the appropriateness of the size standard chosen by the procuring agency. Section 637(a)(17)(B)(iv) of the Act, in contrast, addresses the manner in which an offeror must fulfill a proposed contract. *Id.* § 637(a)(17)(B)(iv). Again, that section states that any offeror which seeks a small business set-aside contract to supply manufactured goods must supply the product of another domestic small business. It is this, and only this, provision of the Small Business Act which Rotech argues will be violated by the intended awards.[12]

Here, the NAICS codes assigned to RFPs 583 and 247 require that, to qualify as a small business offeror, a company must have annual revenues of no more than $6 million and $11.5 million, respectively. Rotech does not argue that this standard is inappropriate, or that Mitchell or FCC are unable to meet it. Instead, plaintiff argues that because the procurements will require Mitchell and FCC to supply manufactured products to the VA, the monetary standards identified by those NAICS codes are replaced by the 500 employee standard found in FAR § 52.212–1. Considering plaintiff's claim that the NAICS codes listed in RFPs 583 and 247 are essentially irrelevant, it would be difficult to conclude that Rotech's protest actually challenges the correctness of those codes.

Defendant is correct, of course, that the mere inclusion of FAR § 52.212–1 in a solicitation does not automatically substitute the

alternative size standard listed therein for the size standard provided by the solicitation's NAICS code. Nor does inclusion of that provision automatically render the solicitation subject to the other requirements of the non-manufacturer rule. Indeed, SBA–OHA has already held, in one instance, that the 500 employee alternative standard did not apply to a solicitation despite its inclusion in its text. *See Size Appeal of Pride Int'l, LLC,* SBA No. 4648 (2004). That conclusion rested, however, on the critical finding that the procurement at issue, for an aircraft lease, fell outside the definition of the term "manufactured item." Based on that finding, SBA–OHA held that the NAICS code listed in the solicitation, and not the non-manufacturer size standard, was applicable. Just as SBA–OHA's decision in *Pride* required it to examine whether the solicitation at issue was one for a manufactured item before determining the appropriate size standard, Rotech's protest requires this court to first consider whether RFPs 583 and 247 call for the provision of manufactured items. Again, plaintiff does not contend that, simply because FAR § 52.212–1 is included in the RFPs, the alternative size standard listed therein automatically overrides their NAICS code standards. Instead, plaintiff argues that the inclusion of that provision in the RFPs, coupled with the fact that the contracts call for the provision of manufactured goods, renders the alternative standard applicable. That argument is at the heart of Rotech's protest. It follows, then, that plaintiff could not have perceived a need to challenge the NAICS codes listed in RFPs 583 and 247. If Rotech succeeds on the merits of this lawsuit, it will become even clearer that no such challenge was necessary or appropriate.

Defendant's argument that the NAICS codes listed in RFPs 583 and 247 were not replaced by the non-manufacturer size standard set out in § 52.212–1 is problematic for a number of reasons. First, the government bases its theory on an assertion that the contracts at issue here are ones for services, as demonstrated by the fact that the com-

---

12. This structure is mirrored in the small business size regulations, which also include two distinct provisions. 13 C.F.R. § 121.402 (2006)

describes the NAICS code procedure, and 13 C.F.R. § 121.406 (2006) reiterates the non-manufacturer rule.

mercial items to be procured will be accompanied by incidental services, such as delivery, installation, and repair. However, the FAR's non-manufacturer size standard states simply that it applies any time an offeror proposes to supply a product which it did not itself manufacture. It does not address, or even allude to, the issue of whether those products are accompanied by services. *See* 48 C.F.R. § 52.212–1. In addition, FAR § 12.301, which orders the inclusion of the alternate size standard in procurements for commercial items, also directs that the standard should be included in "*clauses* in solicitations and contracts for the acquisition of commercial items." 48 C.F.R. § 12.301 (emphasis added). That phrase undermines the contention that § 52.212–1 cannot apply to the portions of a solicitation which call for manufactured items which accompany a procurement for services. Further, the SBA–OHA decision relied on by the government is easily distinguished. In *Pride International,* SBA–OHA determined that a NAICS code size standard was not replaced by the 500 employee non-manufacturer standard, despite its inclusion in a solicitation. It reached that conclusion, however, because the contract at issue was one for the lease of an aircraft, and thus was not a procurement for manufactured goods. The *Pride* decision does not address the controversial linchpin in the government's theory—that the mere existence of services which are incidental to requested manufactured products takes the procurement outside the scope of FAR § 52.212–1. Without adequate support for this claim, the court cannot rely upon it to conclude that the NAICS code size standards remain in effect here. This is especially true given that defendant's interpretation conflicts with a plain reading of the regulation.

For all of these reasons, the court declines to determine, as defendant requests, that Rotech's claim regarding the non-manufacturer rule lacks merit, and then to bootstrap onto this litigation the requirement that a NAICS code challenge must have preceded plaintiff's claim. It is true that, if Rotech is successful, the NAICS codes assigned to RFPs 583 and 247 may, in retrospect, appear to be in error. However, the government has not shown that plaintiff had a duty to raise that claim to the agency before filing this protest. Indeed, the United States has presented no legal argument, or persuasive authority, to demonstrate that Rotech's protest is, in fact, a challenge to the NAICS codes assigned to RFPs 583 and 247. Accordingly, there is no basis on which to conclude that the ten day time limit on NAICS code challenges bars this protest.

### B. The Non–Manufacturer Rule

Rotech's principal contention is that the VA's decision to award small business set-aside contracts to Mitchell and FCC under RFP 583 is arbitrary, capricious, an abuse of discretion, and contrary to law. Rotech argues, specifically, that the VA erred when it decided to award the contracts to Mitchell and FCC without determining their compliance with the Small Business Act's non-manufacturer rule. Rotech argues that because the value of the contracts to be awarded is derived principally from the supply of home oxygen products, any offeror which seeks to qualify under the terms of the solicitation must comply with that provision of the Act, by supplying home oxygen equipment manufactured by a small business. Plaintiff asserts that neither Mitchell nor FCC intends to do so, and thus, they are ineligible for small business awards in the context of these procurements. Rotech asks the court to permanently enjoin any small business set-aside awards to Mitchell or FCC, and to order the VA to apply the non-manufacturer rule to the contested procurements or to conduct a re-solicitation which complies with the rule. In response, defendant admits that the VA made no findings on whether Mitchell or FCC will comply with the non-manufacturer rule. The government contends that such findings are not necessary, however, because the rule does not apply to RFPs 583 and 247. The United States insists that the non-manufacturer rule applies only to contracts for the supply of manufactured products alone, and not to contracts like these, which call for the supply of both manufactured products and services. Indeed, the VA took that position early in this dispute, as demonstrated by a written statement from the CO for RFP 583:

The proposed contracts for home oxygen services are service contracts. The non-manufacturer rule is not applicable to this procurement. It is not solely for manufactured products (oxygen), but also requires the contractor to perform a significant number of services. The Small Business Administration's Office of Hearings and Appeals has held that the nonmanufacturer rule applies to procurements solely for manufactured products, and not to procurements which include services.

AR at 478. Based on this interpretation of the non-manufacturer rule, defendant argues that its conduct here was proper, and should be allowed to proceed.

There is no question that Rotech's protest is centered on the Small Business Act of 1958, 15 U.S.C. §§ 631–51 (2000). The United States Congress first created the Act in 1953 to "aid, counsel, assist, and protect ... the interests of small-business concerns in order to preserve free competitive enterprise [and] to insure that a fair proportion of the total purchases and contracts or subcontracts for property and services for the Government ... be placed with small-business enterprises." *Flexfab, L.L. C. v. United States,* 424 F.3d 1254, 1256 (Fed.Cir.2005) (citing 15 U.S.C. § 631(a)); *see also Contract Mgmt., Inc. v. Rumsfeld,* 434 F.3d 1145, 1147 (9th Cir.2006); 134 Cong. Rec. E3597–03 (daily ed. Oct. 12, 1988) (statement of Rep. Aspen). To that end, the Act "directs federal agencies to reserve some government contracts for small businesses," *Columbian Rope Co. v. Sec'y of Army,* 142 F.3d 1313, 1315 (D.C.Cir. 1998), with a " 'Government-wide goal for participation by small business concerns ... [of] not less than 23 percent of the total value of all prime contracts for each fiscal year.' " *Contract Management,* 434 F.3d at 1147 (quoting 15 U.S.C. § 644(g)(1)). A business is considered a "small business concern" under the Act only if it is "independently owned and operated" and "not dominant in its field of operation." *Columbian Rope,* 142 F.3d at 1315 (quoting 15 U.S.C. § 632(a)(1)). The task of establishing criteria to determine whether individual companies qualify as small businesses, and applying those criteria in individual cases, has been delegated by Congress to the SBA. *Id.* (citing 15 U.S.C.

§§ 632(a)(2)(A), 637(b)(6)). Federal agencies work together with the SBA to establish small business set-asides for contract solicitations. *Contract Management,* 434 F.3d at 1147 (citing 15 U.S.C. § 644(a)).

The Small Business Act imposes a number of requirements which businesses must satisfy if they wish to claim a small business preference in government procurements. Most important to this lawsuit is the Act's requirement "that nonmanufacturer recipients of small business set-aside[ ] ... contracts for manufactured products ... provide the product of domestic small manufacturers or processors on small business set-asides ...—the so-called 'nonmanufacturer rule.' " 35 No. 37 Gov't Contractor 598 (Sept. 29, 1993). The clear purpose of the non-manufacturer rule is "to prevent brokerage-type arrangements whereby small 'front' organizations are set up to bid [on] government contracts, but furnish the supplies of a large concern." *Size Appeal of BNF Mfg. Corp.,* SBA No. 633 (1973). The rule serves, in other words, "to prevent dealers from acting as mere conduits for the products of large manufacturers on small business set-aside procurements." *Size Appeal of Fire–Tec,* SBA No. 1262 (1979); *see also Size Appeal of Nuclear Research Corp.,* SBA No. 2828 (1988). The non-manufacturer rule began as a regulation created by the SBA as a part of its effort to promote small business in the United States. *See* Small Business Size Standards, 49 Fed.Reg. 27925 (July 9, 1984) (citing 13 C.F.R. § 121.5(b)(2) (1984)). In 1988, however, during a major overhaul of the terms of the Small Business Act, Congress codified the rule as a separate section of the statute itself. *See Business Opportunity Development Reform Act of 1988,* Pub.L. No. 100–656, 102 Stat. 3853 (1988); 15 U.S.C. § 637(a)(17) (1988). In this lawsuit, the parties disagree on both the scope of the statutory non-manufacturer rule and the nature of RFPs 583 and 247. Both of those issues affect whether the awards to Mitchell and FCC fall within the statute's purview. Accordingly, this protest presents questions of both statutory and contractual interpretation.

### 1. Interpretation of the Statute—To What Does it Apply?

■ Rotech and the United States disagree first on the proper interpretation of the statutory non-manufacturer rule. It is well settled that statutory interpretation presents a question of law which may be decided by the court on a motion for judgment on the administrative record. *See Curry v. United States,* 66 Fed.Cl. 593, 597 (2005) (citing *Santa Fe Pac. R.R. Co. v. United States,* 294 F.3d 1336, 1340 (Fed.Cir. 2002)). When faced with an issue of statutory interpretation, the court's first and primary task is to examine the relevant statute's language, to determine whether it has a plain and unambiguous meaning. *Lamie v. United States Tr.,* 540 U.S. 526, 534, 124 S.Ct. 1023, 157 L.Ed.2d 1024 (2004) (stating that the "starting point in discerning congressional intent is the existing statutory text"); *Barnhart v. Sigmon Coal Co.,* 534 U.S. 438, 450, 122 S.Ct. 941, 151 L.Ed.2d 908 (2002); *Shoshone Indian Tribe of the Wind River Reservation v. United States,* 364 F.3d 1339, 1345–46 (Fed.Cir.2004) (holding that the plain language of a statute is controlling). In doing so, the court must afford the words "their ordinary, contemporary, common meaning, absent an indication Congress intended them to bear some different import." *Williams v. Taylor,* 529 U.S. 420, 431, 120 S.Ct. 1479, 146 L.Ed.2d 435 (2000); *Murakami v. United States,* 398 F.3d 1342, 1352 (Fed.Cir.2005). When possible, every clause and word of a statute must be given effect. *Mudge v. United States,* 308 F.3d 1220, 1228 (Fed.Cir.2002); *Perez v. Merit Sys. Prot. Bd.,* 85 F.3d 591, 594 (Fed.Cir.1996). The court must likewise avoid an interpretation of a clause or word of a statute which renders another provision inconsistent, meaningless, or superfluous. *TRW Inc. v. Andrews,* 534 U.S. 19, 31, 122 S.Ct. 441, 151 L.Ed.2d 339 (2001); *Messick ex rel. Estate of Kangas v. United States,* 70 Fed.Cl. 319, 324 (2006). If a statute is plain and unambiguous, and the overall statutory scheme is coherent and consistent, the court's inquiry ends, and its sole function is to enforce the statute according to its terms. *Barnhart,* 534 U.S. at 450, 122 S.Ct. 941; *Johnson v. United States,* 529 U.S. 694, 723, 120 S.Ct. 1795, 146 L.Ed.2d 727 (2000) (quoting *United States v. Ron Pair Enters., Inc.,* 489 U.S. 235, 241, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989)). In such a case, the court must not consider "conflicting agency pronouncements" or "extrinsic evidence of a contrary intent" to derive a different meaning from the statutory language. *Messick,* 70 Fed.Cl. at 324 (quoting *Weddel v. Sec'y of Dep't of Health and Human Servs.,* 23 F.3d 388, 391 (Fed.Cir.1994)). Indeed, "courts have no authority to enforce [a] principl[e] gleaned solely from legislative history that has no statutory reference point." *Shannon v. United States,* 512 U.S. 573, 584, 114 S.Ct. 2419, 129 L.Ed.2d 459 (1994). Accordingly, if a statute is plain and unequivocal on its face, an examination of its legislative history is inappropriate. *See Messick,* 70 Fed.Cl. at 324. Put another way, "[t]he court should look beyond the plain meaning of a statute only if the language is ambiguous or a literal interpretation would frustrate the purpose behind the statute." *Fluor Enters., Inc. v. United States,* 64 Fed.Cl. 461, 479 (2005) (citing *Bob Jones Univ. v. United States,* 461 U.S. 574, 586, 103 S.Ct. 2017, 76 L.Ed.2d 157 (1983)).

Here, the central question presented is whether the statutory non-manufacturer rule applies to the contracts offered by RFPs 583 and 247. The starting point in answering that question is, of course, the statutory language. *Barnhart,* 534 U.S. at 450, 122 S.Ct. 941. The statutory rule, found at 15 U.S.C. § 637(a)(17), provides, in relevant part, as follows:

(A) An otherwise responsible business concern that is in compliance with the requirements of subparagraph (B) shall not be denied the opportunity to submit and have considered its offer for any procurement contract for the supply of a product to let pursuant to this subsection or subsection (a) of section 644 of this title solely because such concern is other than the actual manufacturer or processor of the product to be supplied under the contract.

(B) To be in compliance with the requirements referred to in subparagraph (A), such a business concern shall—

(i) be primarily engaged in the wholesale or retail trade;

(ii) be a small business concern under the numerical size standard for the Standard Industrial Classification Code assigned to the contract solicitation on which the offer is being made;

(iii) be a regular dealer, as defined pursuant to section 35(a) of Title 41 (popularly referred to as the Walsh–Healey Public Contracts Act), in the product to be offered the Government or be specifically exempted from such section by section 636(j)(13)(c) of this title; and

(iv) represent that it will supply the product of a domestic small business manufacturer or processor, unless a waiver of such requirement is granted—

(I) by the Administrator, after reviewing a determination by the contracting officer that no small business manufacturer or processor can reasonably be expected to offer a product meeting the specifications (including period for performance) required of an offeror by the solicitation; or

(II) by the Administrator for a product (or class of products), after determining that no small business manufacturer or processor is available to participate in the Federal procurement market.

15 U.S.C. § 637(a)(17).[13] Defendant argues that the scope of the statute, and its accompanying regulation, is ambiguous, because the express language does not state whether the non-manufacturer rule applies only to contracts *solely* for the provision of manufactured goods, or is more expansive, and also affects contracts for both manufactured goods and services.[14] As defendant correctly notes, the phrases "contract for the supply of a product" and "contract to provide manufactured products" are not defined in the statute or regulation. The United States suggests that, to clarify the issue, the court should look to decisions from the SBA–OHA, which has been afforded the authority to expound upon, and interpret, the Act. Defendant argues that those decisions are persuasive, and entitled to deference, because the SBA promulgated the non-manufacturer regulation, and is charged with protecting the interests of small businesses. Def.'s Mot. at 12 (citing *Cathedral Candle Co. v. United States Int'l Trade Comm'n,* 400 F.3d 1352, 1366 (Fed. Cir.2005)). In fact, defendant argues that the court must afford substantial deference

13. The regulatory counterpart to the statute, created by the SBA, states in relevant part:

§ 121.406 **How does a small business concern qualify to provide manufactured products under small business set-aside or 8(a) contracts?**

(a) General. In order to qualify as a small business concern for a small business set-aside or 8(a) contract to provide manufactured products, an offeror must either:

(1) Be the manufacturer of the end item being procured (and the end item must be manufactured or produced in the United States); or

(2) Comply with the requirements of paragraph (b), (c) or (d) of this section as a non-manufacturer, a kit assembler or a supplier under Simplified Acquisition Procedures.

(b) Nonmanufacturers.

(1) A concern may qualify for a requirement to provide manufactured products as a non-manufacturer if it:

(i) Does not exceed 500 employees;

(ii) Is primarily engaged in the retail or wholesale trade and normally sells the type of item being supplied; and

(iii) Will supply the end item of a small business manufacturer or processor made in the United States, or obtains a waiver of such requirement pursuant to paragraph (b)(3) of this section.

13 C.F.R. § 121.406 (2006).

14. Defendant also contends, apparently in the alternative, that the plain language of the statute and regulation supports its interpretation, because the language provides that the non-manufacturer rule applies to contracts to provide manufactured products, but it does not mention mixed-purpose contracts. *See* Def.'s Reply at 2 (citing 15 U.S.C. § 637(a)(17)) ("If the Court were to interpret the exact language of this section, it only applies to 'any procurement contract' for 'the supply of a product'.... However, RFP 247 and RFP 583 are not procurements solely for the supply of products[;] ... both RFP 247 and RFP 583 are solicitations for the supply of *multiple products and services.*") (emphasis in original).

to those decisions, because they require SBA to interpret a regulation which the agency itself promulgated. Def.'s Reply at 5 (citing *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994)). The government claims that, based upon this increased deference, the agency's interpretation of the non-manufacturer rule must be upheld, unless it is plainly erroneous or inconsistent with the regulation.

In that regard, defendant first cites the agency's decisions in *Size Appeal of John R. Bermingham Co.*, SBA No. 1889 (1984) and *Size Appeal of Best Western InnTowne Hotel*, SBA No. 2574 (1986). In each of those decisions, the SBA was called on to interpret the regulatory version of the non-manufacturer rule, and it determined that the regulation did not apply to contracts which called for the provision of services. The United States also emphasizes a more recent decision, *Size Appeal of Pride Int'l, LLC*, SBA No. 4648 (2004), in which the SBA–OHA held that the non-manufacturer rule did not apply to a contract for the lease of an aircraft, because it "was not a procurement for a manufactured item, but for [a] lease . . . ." Def.'s Mot. at 13. The United States argues that the distinction between purchased and leased goods is important here, because the VA intends to lease several of the items listed in the RFPs. And most importantly, defendant asks the court to distinguish this case from *Size Appeal of Arizona Medical Supply Co.*, SBA No. 1295 (1979). In that protest, a disappointed bidder challenged a procurement for the sale of prosthetic equipment to a VA hospital which also required equipment delivery, pickup, maintenance, and storage. The VA's contracting officer had determined that the procurement was one for services, because "[p]rovision of equipment is only one function. There are a number of other functions that must be performed, and they fall within the service category." Arizona Medical Supply disagreed, and filed an appeal to SBA. On review, SBA noted the following facts regarding the procurement:

> There are about 70 different types of equipment. The concerns providing the equipment and associated services are primarily retailers of medical equipment.

They do not make the equipment themselves, but supply the products manufactured by others. The price they charge is slightly more than the wholesale price of the equipment. The only separate charge identified on the solicitation other than for sale of the equipment is for pickup and delivery.

> In the prior year on the same solicitation, the great proportion of the value was for the equipment, and the contracting officer expects this to hold true for the current procurement.

*Id.* On review, the SBA looked to several regulations, including its own small business size regulation, § 121.3–1(b)(4), which provided that "if a multi-item procurement requires the successful bidder to deliver all items and/or perform all services being procured, the applicable size standard is that for the industry whose products or services account for the greatest proportion of the contract." *Id.* (quoting 13 C.F.R. § 121.3–1). The agency determined, based on that regulation, that the contract was one for supplies:

> The great proportion of the procurement value relates to the sale of equipment, and the value attributable to the services is incidental. Accordingly, the procurement is primarily for the sale of prosthetic equipment.

> There are about 70 line items being procured. The concerns who provide the equipment are not manufacturers of the equipment. Accordingly, they must meet the requirements of the nonmanufacturing rule. That rule provides that the concern must provide the products of a small business manufacturer.

*Id.* Defendant argues that the decision in *Arizona Medical Supply* is distinguishable, because RFPs 583 and 247 require significantly more services than did the solicitation reviewed there. The United States also contends that the analysis used in *Arizona Medical Supply* was overruled by a later decision, *Size Appeal of Empire Home Medical*, SBA No. 4291 (1998), which is "much more recent in time and applies the current regulatory nonmanufacturer rule, [and] accurately reflects the SBA's current position on the

nonmanufacturer rule...." Def.'s Reply at 5 n. 3. In that case, the SBA–OHA reviewed a VA solicitation for "home oxygen services" which required the contractor to

> provide home oxygen services to patients, as ordered by the VA ... provide oxygen and equipment for the patients' use at home; train patients and caregivers in the use and care of the equipment; periodically assess patients' medical condition; notify attending physicians of changes in patients' condition; and provide emergency services.

*Empire Home Medical,* SBA No. 4291. On review, rather than adopting the reasoning of *Arizona Medical Supply,* the SBA–OHA held simply that the non-manufacturer regulation did not apply to the solicitation, because it required the contractor to provide a "significant number of services" to patients in addition to providing equipment. *Id.* (citing 13 C.F.R. § 121.406(a-b)). Defendant points out that the procurement at issue in *Empire Home Medical* had been assigned a wholesale Standard Industrial Classification (SIC) code, which was used to describe both contracts for supplies and contracts for services, depending on the circumstances presented, and to which the non-manufacturer rule sometimes applied.[15] Def.'s Reply at 12 (citing Small Business Size Standards; Revision; Correction, 54 Fed.Reg. 35454 (Aug. 28, 1989) (stating that not all wholesale trade contracts are subject to the non-manufacturer rule)). The United States contends that RFPs 583 and 247 are identical to the solicitation examined in *Empire Home Medical,* and so, the court should follow that decision. Defendant concedes that the cost of the supplies required by RFPs 583 and 247 outweighs that of the accompanying services, but insists that the solicitations nevertheless require a significant amount of services, including labor, supervision, management, transportation of equipment, equipment assessment, patient education and instruction, basic home safety review, scheduling, preventative maintenance and inspection, pick-up and removal of equipment and supplies,

emergency services, therapist services, and monitoring of patient health. Defendant also points to the non-manufacturer regulation's history as evidence that the SBA has consistently construed the rule to apply only to contracts solely for supplies, both before and after the statutory version of the non-manufacturer rule took effect.

Finally, as a matter of policy, the government claims that the SBA's interpretation of the non-manufacturer rule is reasonable because "where services are a significant part of the procurement, labor costs are the major expense for the contractor. This is especially true for the home respiratory therapy industry where studies have shown that labor costs are the largest operating costs." Def.'s Reply at 7. The government contends that, in these types of mixed-purpose contracts, the goals of the Small Business Act are better served by the application of the limitation on subcontracting rules applicable to service contracts than they would be by application of the non-manufacturer rule. *Id.* at 8 (citing 48 C.F.R. § 52.219–14(b)(1) (2005)) (section of FAR titled "Limitations on Subcontracting"); 13 C.F.R. § 125.6(a)(1) (2006) (section of SBA regulations titled "Prime contractor performance requirements (limitations on subcontracting)"). The United States argues that the agency's interpretation of the rule actually protects the interests of small businesses because, if the non-manufacturer rule applied to every procurement which included even one manufactured product, the government's ability to use small business set-asides would be extremely limited, given that many manufactured products simply are not produced by small business manufacturers.

In response, Rotech acknowledges the government's position that "the nonmanufacturer rule applies to procurements *solely* for manufactured products, and not to procurements which *include* services." Pl.'s Mot at 19 (citing AR at 478) (emphasis in original). Plaintiff contends, however, that this interpretation is contrary to the plain language of the statute. Rotech argues that the statuto-

---

**15.** SIC codes are predecessors to NAICS codes: "[e]ffective October 1, 2000, the NAICS replaced the previous Standard Industrial Classification (SIC) system." *Advanced Systems Technology,* 69 Fed.Cl. at 476 n. 3 (citing 65 Fed.Reg. 30836 & 30840 (May 15, 2000) (amending 13 C.F.R. § 121.101)).

ry non-manufacturer rule is unambiguous, because it states that it applies to *"any* procurement contract for the supply of a product." *Id.* (quoting 15 U.S.C. § 637(a)(17)(A) (emphasis added)). Plaintiff makes an identical argument regarding the SBA regulation which implements that rule, noting that, like the statute, "this regulation does not limit the application of the Nonmanufacturer Rule based on what else is being procured at the same time." Pl.'s Resp. at 16. Plaintiff likewise points out that RFPs 583 and 247 include provisions which restate parts of the non-manufacturer rule, and that "[n]othing in either RFP limits the Rule's application to when an offeror is providing only products and no services. Instead, the RFP applies the Nonmanufacturer Rule whenever an offeror proposes to furnish 'an item' [which it did not itself manufacture]." *Id.* at 15.

Rotech also disagrees with the government's contention that SBA's interpretation of the non-manufacturer rule should be given deference. Plaintiff argues that, because the statute is clear and unambiguous, no such deference is appropriate, and that the agency has no discretion to violate an explicit statutory mandate. Plaintiff argues that deference is also inappropriate because SBA's decisions on the scope and applicability of the non-manufacturer rule are inconsistent, and unpersuasive. Rotech argues, for example, that *Empire Home Medical,* which "mechanically decline[d]" to apply the non-manufacturer rule because the procurement included services, is irreconcilable with *Arizona Medical Supply,* in which the SBA–OHA looked to the greatest proportion of the contract's value to determine the rule's applicability. Plaintiff also claims that the sources cited by SBA–OHA in *Empire Home Medical* do not actually support its conclusion, and that "[t]his is exactly the kind of unreasoned decision to which Courts have consistently declined to defer." *Id.* at 21 (citing *Fed. Nat'l Mortgage Assoc. v. United States,* 379 F.3d 1303, 1309 (Fed.Cir.2004)). Rotech points out that, in that decision, the SBA–OHA did not address the text of the Small Business Act, but instead relied exclusively on its own decisions in *Best Western InnTowne Hotel* and *John R. Bermingham,* "as if they were still good law despite the subsequent enact-

ment of the statutory Nonmanufacturer Rule." Pl.'s Mot. at 24. Moreover, Rotech claims that the regulatory history cited in that decision does not address whether a procurement that includes a fractional amount of services in a contract largely for products is properly excluded from the non-manufacturer rule's scope, but that SBA nonetheless relied on that history to reach its conclusion. And plaintiff disputes the government's insistence that the solicitation reviewed in *Empire Home Medical* is identical to RFPs 583 and 247, noting that "there is simply no record in *Empire* of the actual items being procured." *Id.* at 17 n. 10. Rotech also claims that *Size Appeal of Pride International, LLC* is distinguishable, because it did not address the sort of contract at issue here, but held only that the non-manufacturer rule did not apply to an airplane lease, which it states is not a procurement for a manufactured item.

In a similar vein, Rotech argues that the decisions cited by the government with respect to the instant case are irrelevant, because they "deal with legal issues entirely separate from the Nonmanufacturer Rule, [and] were decided prior to the statutory enactment of the Nonmanufacturer Rule...." *Id.* at 16. As plaintiff correctly notes, none of those SBA decisions discusses the language of the statute. In fact, *Best Western InnTowne Hotel* and *John R. Bermingham* were decided before the non-manufacturer rule was enacted. *Id.* (citing *Business Opportunity Development Reform Act of 1988,* Pub.L. No. 100–656, 102 Stat. 3853 (1988); *Small Business Administration Reauthorization and Amendments Act of 1990,* Pub.L. No. 101–574, 104 Stat. 2814 (1990)). Plaintiff notes that *Best Western InnTowne Hotel* and *John R. Bermingham* dealt with the non-manufacturer rule only peripherally, and did not address whether the rule applies to mixed-purpose contracts. Rotech also observes that the government's reliance on older versions of the regulatory non-manufacturer rule is inappropriate here, because they have been superseded by the statute itself. Plaintiff acknowledges SBA's 1984 statement that the rule did not apply to "a construction or service contract." Pl.'s

Reply at 7 (citing Small Business Size Standards, 49 Fed.Reg. 27925 (July 9, 1984)). Rotech notes, however, that this exception to the regulatory version of the rule was not adopted as a part of the statute. Rotech states that, instead of adopting SBA's exception for "a construction or service contract," Congress "adopted the new and broader language applying the Rule to 'any procurement contract for the supply of a product.'" *Id.* at 8. Plaintiff posits that "the decision of Congress not to use the prior regulation's language—as well as the actual language adopted by Congress—provides yet additional support for Rotech's Motion." *Id.* Moreover, plaintiff points out that after the statute was enacted, the SBA amended the non-manufacturer regulation, so that it would comport with the broad wording of the statute. The new version of the regulation removed the language which had created an exception for contracts "other than a construction or services contract." *Id.* (citing 13 C.F.R. § 121.406). Plaintiff contends that

> [a] review of this language documents that, prior to the Rule's statutory enactment, the SBA arguably created an exception applicable to "a construction or services contract," but that this exception was deleted from the SBA regulations after the Rule's enactment in statute (presumably to conform to the new statutory mandate).

*Id.* And plaintiff points out that, even if the regulation had not been amended, the exception would no longer have any effect because "[c]ontradictory administrative authority cannot be used to interpret a subsequently enacted law, especially one in which the statutory language is clear." *Id.* at 9.

Finally, plaintiff argues that the government's interpretation of the non-manufacturer rule would undermine the purpose of the Small Business Act and render the rule ineffectual:

> Since the transport of products (delivery and relocation) is part of virtually every procurement of products, Defendant's theory suggests that any agency has virtually unfettered discretion in virtually any procurement to evade the requirement and policies underlying ... the statutory Non-manufacturer Rule so long as the products

being procured are to be delivered by the contractor.

*Id.* at 22.

From all of these arguments, one clear question emerges—whether the court should defer to SBA's interpretative gloss on the regulatory non-manufacturer rule, and graft that interpretation onto its statutory counterpart in the Small Business Act. The answer to that question depends, in large part, on whether the agency's interpretation of the Act is entitled to deference. To make that determination, a two step inquiry is necessary. First, the court must examine whether Congress has spoken directly on the issue at hand, through its express statutory language. *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 842, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). If it has done so, both the court and the agency must give effect to Congress' express, unambiguous intent. *Id.* at 842 & n. 9, 104 S.Ct. 2778. If Congress has not spoken on the issue, however, its silence or ambiguity may constitute an implicit delegation to the agency to interpret the issue. In that case, the court must then examine whether the agency's interpretation is based on "a permissible construction of the statute." *Id.* at 843, 104 S.Ct. 2778. In doing so, the court must accord "considerable weight ... to an executive department's construction of a statutory scheme it is entrusted to administer." *Id.* at 844, 104 S.Ct. 2778. Indeed, "[i]f a statute is ambiguous, and if the implementing agency's construction is reasonable, *Chevron* requires a federal court to accept the agency's construction of the statute, even if the agency's reading differs from what the court believes is the best statutory interpretation." *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.,* 545 U.S. 967, ——, 125 S.Ct. 2688, 2699, 162 L.Ed.2d 820 (2005).

Under the scheme set out in *Chevron,* then, the court's first task is to determine whether Congress has spoken on the precise issue contested by the parties, by examining the text of the statutory non-manufacturer rule. *Chevron,* 467 U.S. at 842, 104 S.Ct. 2778. The parties disagree specifically on the interpretation of the phrase "offer for any procurement contract for the supply of a

product...." 15 U.S.C. § 634(a)(17)(A). Plaintiff asks the court to focus on the word "any," and conclude that the statute is broad in scope. Defendant, on the other hand, focuses on the phrase "contract for the supply of a product," and argues that if this purpose—to supply products—is not the sole focus of a contract, the contract falls outside the statute's purview.

One recent decision from the United States Court of Federal Claims involved a similar question of statutory interpretation, and it is instructive here. In *Fluor Enterprises Inc. v. United States,* Fluor Daniel Enterprises, Inc. (Fluor), an architectural firm, objected to the United States' application of a federal fee limitation statute to its payment on a large government contract. 64 Fed.Cl. 461 (2005). The statute at issue, a part of the Brooks Architect–Engineers Act of 1972 (the Brooks Act), provided that, in cost-plus-a-fixed-fee contracts for architectural or engineering (A & E) services, a contractor could be paid, in addition to its costs, a fee of no more than 6 percent of the estimated cost of its work. 41 U.S.C. § 254(b) (2000). Fluor, which had been awarded a services contract with the National Oceanographic and Atmospheric Association (NOAA), filed suit under the Contract Disputes Act to appeal a contracting officer's decision that the agency had overpaid Fluor, in excess of the Brooks Act's 6% limitation. *Fluor,* 64 Fed.Cl. at 462. Fluor claimed that § 254(b) and the fee limitation did not apply to its contract with NOAA, because that contract was not solely for A & E services, but one "for a broad range of professional services of which Fluor's A & E services were only a minor part." *Id.* at 471. The plaintiff argued further that the 6% fee limitation was intended by Congress to apply only to those contracts that called for A & E services exclusively. *Id.* The government disagreed, contending that the limitation applied to any contract which required A & E services, regardless of the extent of those services as compared with the non-A & E services provided under the same contract.

After examining the plain language of § 254(b), the court disagreed with Fluor's argument because "[a]t least facially, there is nothing ambiguous about this language that might suggest that its applicability should only extend to contracts *primarily* or *substantially* for A & E services or, alternatively, that A & E services to be rendered as part of a broad professional services contract like Fluor's might somehow be exempt from the statute's purview." *Fluor,* 64 Fed.Cl. at 479 (emphasis in original). The court explained:

Fluor advances a syllogism that Congress intended the 6% limitation to apply only to *"contracts* for architectural and engineering services," with primary focus on the type of contract or manner in which the contract is classified rather than on the substantive services to be performed. According to Fluor, the statute "does not provide that the limitation applies to *any* contract that includes A & E services regardless of whether those services constitute only a minor portion of the work required." Instead, so the syllogism goes, the statute was only intended to specifically apply to a contract that is properly characterized *in its entirety* (or, mostly) as an "A & E contract," and therefore the statute does not apply to Fluor's contract. In support of this argument, Fluor postulates that the legislative history of the 6% limitation contains "nothing that indicates a contrary intent." However, Fluor has been unable to present any affirmative support that would lead the court to recognize any ambiguity in the language of the statute. Instead, Fluor points to the statutory progression of the 6% fee limitation, pointing out a legislative intent to circumscribe the *types of services* in a "contract[ ] for architectural and engineering services" that are subject to the 6% limitation. Out of this sound interpretation of the Brooks Act's policies, Fluor tries to imply a parallel legislative intent to narrowly define the *types of contracts* subject to the limitation. The court rejects Fluor's attempt to take a facially unambiguous statute and render it ambiguous through clever contrivances ... it strikes the court as counter-intuitive to read § 254(b) as Fluor would counsel—to imply a restriction on the types of contracts to which the statute applies—in the absence of specific language suggesting

such a limitation. The facial reading of the statute seems to unambiguously require that, when architectural and engineering services are the subject of a contract, the fees for those services shall be subject to the statutory limitation. *Id.* at 479–80. The court found further that, even if the statute were ambiguous, which would enable the court to examine the legislative history of the Brooks Act, nothing in that history appeared to support plaintiff's interpretation. *Id.* at 480. For those reasons, inter alia, the court concluded that "there does not appear to be support for Fluor's position, other than a very strained reading of both the statute and the legislative history, that counters the natural reading of § 254(b) and the provisions of the FAR that implement that section." *Id.*

On the issue of statutory interpretation, the court finds the reasoning of *Fluor Enterprises* to be persuasive. Here, as in that case, defendant argues that the statute, despite its use of the phrase "any procurement contract for the supply of a product," actually applies to only those procurement contracts which are *entirely* for the supply of a product. *See and compare Fluor,* 64 Fed.Cl. at 479. The court cannot, however, ignore Congress' clear choice of the word *"any"* as the only adjective describing the phrase "procurement contract for the supply of a product." 15 U.S.C. § 637(a)(17)(A) (emphasis added). By opting not to use further modifying terms, such as "primarily," "principally," or "entirely," Congress declined to limit, in any way, the specific *types* of "procurement contract[s] for the supply of a product" to which the restriction should apply. Indeed, the broad scope of the language used in § 637(a)(17) is even clearer when it is compared with the terms used in another federal procurement statute, the Service Contract Act of 1965 (the Service Contract Act), 41 U.S.C. §§ 351–58 (2000). That statute applies to "every contract ... *the principal purpose of which* is to furnish services...." *Id.* § 351 (emphasis added). Its counterpart, the Walsh–Healy Public Contracts Act, 41 U.S.C. § 35 *et seq.* (2000), applies to con-

tracts for which the principal purpose is not the furnishing of services, but instead, "the manufacture or furnishing of materials, supplies, articles, or equipment...." *Id.* § 3 5.[16] As the language of the Service Contract Act makes clear, Congress can, and does, sometimes include in its language limiting terms which carefully define a statute's scope. *See and compare Murakami,* 398 F.3d at 1352 (stating that if Congress intended a statute to be more narrow than its plain language suggested, it "could have used stricter language in crafting the Act") (citing *Doyon, Ltd. v. United States,* 214 F.3d 1309, 1316 (Fed.Cir.2000)). Congress' refusal to do so here is clear and unambiguous, and must be respected.

In addition to the fact that the interpretation urged by the United States would require a strained reading which is impermissible in the face of the statute's clear language, the court finds that the historical evidence to support that reading of the statutory non-manufacturer rule is just as lacking as it was in *Fluor Enterprises. See* 64 Fed.Cl. at 481. It is, of course, critical to recognize that, "[g]iven the plain thrust of the statutory language, only clear congressional intent to the contrary would warrant" a narrow interpretation of the non-manufacturer rule. *Am. Fed. of Labor and Congress of Indus. Orgs. v. Donovan,* 757 F.2d 330, 345 (D.C.Cir.1985). Here, however, nothing in the legislative history of the Small Business Act indicates that Congress intended to create an exception to the non-manufacturer rule like the one suggested by the government. In fact, the unique history of the rule, in its statutory and regulatory forms, indicates just the opposite.

As the court explained earlier, the regulatory version of the non-manufacturer rule existed for a number of years before Congress adopted it formally as a part of the Small Business Act. *See Business Opportunity Development Reform Act of 1988,* Pub.L. No. 100–656, 102 Stat. 3853 (1988); *Small Business Administration Reauthorization*

---

**16.** While this is generally true, other federal statutes apply to specialized categories of contracts. Wage rates for construction contracts, for exam-

ple, are governed by the Davis–Bacon Act, 40 U.S.C. § 3141 *et seq.* (2000).

*and Amendments Act of 1990,* Pub.L. No. 101–574, 104 Stat. 2814 (1990). At the time the statute was created, Congress had at its disposal all of the SBA decisions which interpreted and applied that rule. When Congress enacted the statute, however, it chose not to use statutory language which would have incorporated SBA's interpretive gloss on the rule, or its policy to apply the rule only to contracts solely for the supply of manufactured goods. Instead, Congress codified a rule which provides that *any* procurement contract for the supply of a product is subject to the non-manufacturer rule. *See* 15 U.S.C. § 637(a)(17)(A). In the court's view, that language clearly and unambiguously provides that the non-manufacturer rule applies to all supply contracts, whether they implicate some level of services or not. No legislative intent sufficient to overcome that plain reading of the statute exists here. *Donovan,* 757 F.2d at 345.

Moreover, even if the court were to find any ambiguity in the language of the statutory non-manufacturer rule, the court agrees with Rotech that this is not an appropriate instance in which to afford deference to SBA's interpretations of that rule. It is true that, in a typical case, an agency's interpretation of a statute it is charged with promoting is entitled to deference, so long as it is reasonable. *See Chevron,* 467 U.S. at 842–43, 104 S.Ct. 2778. Regulations promulgated by an agency to fill a gap in a statutory scheme, pursuant to a statutory directive to do so, are also entitled to deference from the court, so long as they are reasonable and consistent with the statute's language. *Adair v. United States,* 70 Fed.Cl. 65, 70 (2006) (citing *Doe v. United States,* 372 F.3d 1347, 1362 (Fed.Cir.2004)); *Am. Airlines, Inc. v. United States,* 68 Fed.Cl. 723, 730–32 (2005) (citing *United States v. Mead Corp.,* 533 U.S. 218, 226–27, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001)). And there is no question that SBA is charged with issuing rules and regulations which will further the underlying policies of the Small Business Act. *See Contract Management,* 434 F.3d at 1147; 15 U.S.C. § 634(b). Moreover, an agency's interpretation of its own regulation is entitled to substantial deference, unless it is plainly erroneous or inconsistent with the regula-

tion's express language. *Thomas Jefferson University,* 512 U.S. at 512, 114 S.Ct. 2381. The court is not convinced, however, that deference to the SBA's decisions interpreting the non-manufacturer statute and regulation is required here. Most importantly, *Empire Home Medical* is the only SBA decision on point which was issued after the non-manufacturer statute was enacted, and thus could arguably be seen as interpreting that statute. However, that decision does not mention, let alone attempt to construe, the express language of 15 U.S.C. § 637(a)(17). In addition, although several of the agency's pre-enactment decisions purport to interpret the regulatory version of the rule, those decisions do not appear to be consistent or well reasoned.

One of the first SBA decisions to consider the scope of the non-manufacturer rule, then in its regulatory form only, was *John R. Bermingham Co.,* SBA No. 1889 (1984). In that case, SBA examined a solicitation which called for the refurbishing of engines. SBA described the procurement as "a combination of work which could be classified as 'service' and 'supply.' " *Id.* After reviewing the terms of the solicitation, SBA noted that the eventual awardee would not provide new supplies to the procuring agency, but instead would refurbish existing ones. SBA determined, therefore, that the contract was one for services, rather than supplies. *Id.* (stating that "Leslie would be supplying to Bermingham the end item, the overhauled regulator or controllers . . . and not a new item. It is therefore, found that this solicitation is a 'Service' contract. . . ."). The agency then held that "the nonmanufacturer rule . . . is not applicable because this regulation precludes service contracts." That holding appears to be based on the 1984 version of the non-manufacturer regulation, which provided that the rule applied to contracts "other than a construction or service contract." *See, e.g.,* 49 Fed.Reg. 27925 (1984). SBA did not, however, cite any specific portion of that regulation in the text of its decision, or elaborate upon its conclusion in any way. In fact, it appears that, after the SBA determined that no new products were required by the solicitation, it treated the procurement as one purely for services, to which the rule's inap-

plicability was obvious, rather than a mixed-purpose contract, as the introductory language of the decision indicated. And the SBA apparently found it unnecessary to elaborate on its holding, because the rule undoubtedly did not apply to contracts purely for services.[17] The reasoning of *John R. Bermingham* is undoubtedly based on the unique facts presented in that case. For that reason, the court agrees with Rotech that it is only nominally relevant to whether the non-manufacturer rule applies to mixed-purpose contracts.

Unfortunately, the later SBA decisions which considered the scope of the non-manufacturer rule did little to clear up the questions left by the *John R. Bermingham* decision. In *Best Western InnTowne Hotel*, SBA No. 2574 (1986), also decided before the enactment of the non-manufacturer statute, the SBA did little more than restate the service contract exception to the non-manufacturer rule, as it had been enunciated in *John R. Bermingham*. More importantly, it apparently failed to recognize the import of the facts presented in *John R. Bermingham*, or the fact that the decision could not be easily adapted for use in other contexts. And, as in *John R. Bermingham*, there is no evidence that SBA undertook a specific examination of the language of the non-manufacturer regulation before reaching its conclusion.

SBA's third relevant decision, *Empire Home Medical*, SBA No. 4291 (1998), is the most factually similar to the dispute presented here. In that protest, SBA determined that a contract for the provision of home oxygen services was not subject to the non-manufacturer rule. The agency explained its interpretation as follows:

> This Office has held the nonmanufacturer rule applies to procurements solely for manufactured products, and not to procurements which include services.

The Agency expressly ratified this case precedent, in comments accompanying a subsequent revision of the size standard tables. These comments explicitly described the rule as not applying to procurements which include services. More recent revisions of the rule have not extended it beyond its original scope, i.e., it is limited to manufactured products. Therefore, the Administrative Judge finds the nonmanufacturer rule does not apply to this procurement, which includes services as well as manufactured products.

*Id.* (internal citations omitted). Rotech argues that the court should not rely on Empire Home Medical because the authorities used by SBA to reach its decision do not actually support its conclusion. On this point, the court agrees. The agency comments cited by the SBA were published in the Federal Register in 1989, and they state, in relevant part:

> On March 31, 1989, the Small Business Administration (SBA) revised its regulations to set an explicit size standard of 500 employees for nonmanufacturers. A "nonmanufacturer" is a company offering to supply to the Federal Government an item which it does not itself manufacture. However, the subheadings of the size standards table for Division F—Wholesale Trade and Division G—Retail Trade can give the unintended impression that all retail and wholesale procurement contracts, including those for services, are included under the 500–employee nonmanufacturer standard. The regulations cover only contracts for supplies. Institutional food service, computer software and other service-type contracts are excluded from the nonmanufacturer's size standard. The final rule is corrected by adding the words "of supplies" to the subheadings of Division F and G.

---

**17.** This reasoning is not surprising, when read in the context of other areas of regulatory law being developed by the SBA during that period. As the United States Court of Appeals for the District of Columbia Circuit explained in *American Federation of Labor and Congress of Industrial Organizations v. Donovan*, the Code of Federal Regulations was amended in the early 1980s to address the difficult classification of contracts for the overhaul and rebuilding of engines and heavy equipment as "service" versus "supply" contracts. 757 F.2d at 346 (citing and explaining Service Contract Act; Labor Standards for Federal Service Contracts, 48 Fed.Reg. 49736, 49746 & 49780 (Oct. 27, 1983)); *see also Curtiss–Wright Corp. v. McLucas*, 364 F.Supp. 750, 770–73 (D.N.J.1973).

Small Business Size Standards; Revision; Correction, 54 Fed.Reg. 35454–01 (Aug. 28, 1989). A later entry in the Federal Register, on January 31, 1996, explained the implementation of several changes to the non-manufacturer rule, but did not address whether mixed-purpose contracts are governed by the rule. *See* Small Business Size Standards, 61 Fed.Reg. 3280, 3296 (Jan. 31, 1996). Rotech is correct that these entries in the Federal Register, contrary to the way they are cited by the SBA, do not explicitly exempt mixed-purpose contracts from the scope of the non-manufacturer rule. For that reason, they provide little support for the SBA's conclusion that a contract for home oxygen equipment and accompanying services is exempt from the rule. Further, although *Empire Home Medical* was issued after the codification of the statutory non-manufacturer rule, there is no evidence that the SBA–OHA considered the text of the statute in reaching its decision. For these reasons, the court finds that the *Empire Home Medical* decision relies, at bottom, on little more than SBA–OHA's previous holdings on the scope of the regulatory non-manufacturer rule, none of which appears to be particularly persuasive.

In the court's view, the regulatory history underlying SBA's version of the non-manufacturer rule supports the interpretation of the statute which is urged by Rotech. To show that mixed-purpose contracts are outside the rule's purview, defendant relies on the agency's statement in 1984 that the rule applied in cases of "a contract other than a construction or service contract," and on its 1995 statement that the rule applies to a "procurement of manufactured or processed products." Def.'s Resp. at 3 (citing Small Business Size Standards, 49 Fed.Reg. 27925 (July 9, 1984); Small Business Size Regulations; Non–Manufacturer Rule, 60 Fed.Reg. 27924 (May 16, 1995)). Notably absent from either of those statements, however, is use of the word "solely" or "principally," or any other term which would narrow the range of supply contracts within the regulation's scope. Similarly, the text of prior versions of the regulation state that the rule does not apply to "construction or service contracts," but none speaks to the issue of mixed-purpose contracts, or provides that a manufac-

turing contract which involves an incidental amount of services is to be treated as an exempt service contract. *See id.; compare* 48 C.F.R. § 52.219–6(c). Further, and most importantly, the current version of the non-manufacturer regulation, which followed the enactment of the non-manufacturer statute, completely removed the exception for "construction or service contract[s]" from its language. *See* 13 C.F.R. § 121.406.

There is absolutely no question that contracts for services are not subject to the non-manufacturer rule. Defendant has presented more than adequate support for that proposition, citing legislative and regulatory history and provisions of the Code of Federal Regulations to that effect. The next inferential leap in defendant's argument, however, that *any* service aspect of a contract, no matter how minute, exempts a contract from that rule, is unsupported, save a handful of questionable agency decisions. It is true that the SBA has examined the non-manufacturer rule and has interpreted it to apply only to contracts solely for the supply of a product. At other times, however, it has arrived at an opposite conclusion. *Compare Arizona Medical Supply*, SBA No. 1295 (1979) *with Empire Home Medical*, SBA No. 4291 (1998). More importantly, the plain language of the statutory non-manufacturer rule, which is yet to be interpreted explicitly by an agency or court, utilizes exceptionally broad wording. *See* 15 U.S.C. § 637(a)(17). By its plain and ordinary meaning, that statute applies to all manufacturing contracts, whether accompanied by an ancillary request for services or not. *Id.* And again, nothing in the scant legislative history behind the Act demonstrates congressional intent to attribute a meaning to the statute which is different than the one espoused by its clear language.

Finally, there is no question that, if the VA's interpretation of the non-manufacturer rule is allowed to stand, it will significantly undermine the Small Business Act's primary goal—to promote the participation of small businesses in federal government contracting. Again, the non-manufacturer rule was "designed to ensure that small businesses actually perform a significant part of the work required by government contracts that

**424**

they win." *Columbian Rope*, 142 F.3d at 1315. Here, however, it is impossible to overlook the reality that, if Mitchell and FCC receive small business awards under RFPs 583 and 247, they will "act[ ] as mere conduits for the products of large manufacturers on small business set-aside procurements." *See Size Appeal of Fire-Tec*, SBA No. 1262 (1979); *see also Size Appeal of Nuclear Research Corp.*, SBA No. 2828 (1988). This is exactly the sort of arrangement which the non-manufacturer rule was created to prevent. It is true that Mitchell and FCC will benefit marginally from those awards, by earning profits associated with the resale of home oxygen equipment to the VA. However, their participation will undercut the intended, and much greater benefit which would be enjoyed by a small business chosen to supply that equipment to the VA directly.

For all of these reasons, the court concludes that the statutory non-manufacturer rule does, in fact, apply to contracts for the supply of manufactured items which also require the provision of some services. It follows, then, that the rule applies to the contracts offered via RFPs 583 and 247. Accordingly, the VA's decision to award work under those solicitations, without examining each offeror's intent to comply with the rule, was arbitrary and capricious. In an abundance of caution, however, the court will go on to consider the second prong of the parties' dispute. Assuming that contracts which call for a significant number of services are exempt from the non-manufacturer rule, Rotech and the United States also disagree on whether RFPs 583 and 247 fall within that exception.

### 2. Interpretation of the Solicitations–Contracts for Supplies, Services, or Both?

The second issue central to this protest is whether RFPs 583 and 247 offer contracts for supplies only, or contracts for both supplies and services. Rotech argues that, even if the non-manufacturer statute is narrow, and applies only to contracts solely for the provision of manufactured goods, RFPs 583 and 247 nevertheless fall within its scope. Plaintiff argues that the services re-

quired under the proposed contracts are so slight in comparison to the manufactured goods required thereunder that they are *de minimus*. Rotech claims, therefore, that the contested RFPs may be characterized as offering contracts solely for manufactured goods, to which the rule undoubtedly applies. Defendant disagrees, arguing that the procurements require a significant number of services, and thus fall outside the statute's purview. These arguments make it clear that, even assuming defendant's interpretation of the rule to be correct, the United States must also establish that these RFPs actually offer mixed-purpose contracts necessarily classified as service contracts instead of supply contracts in order to prevail in this protest. Accordingly, the government's contentions regarding the nature of RFPs 583 and 247 are critical to its claim that the VA's conduct was proper.

Clearly, whether RFPs 583 and 247 should be classified as procurements for supplies or as procurements for services requires the court to interpret the terms of those documents. It is well settled that the task of construing the terms of a government solicitation essentially involves contract interpretation, and therefore presents issues of law to be determined by the court. *Overstreet Elec. Co. v. United States*, 59 Fed.Cl. 99, 112 (2003) ("The interpretation of a solicitation is not a matter of *post hoc* subjective opinion but is an objective question of law."); *Banknote*, 56 Fed.Cl. at 389; *see also Grumman Data Systems*, 88 F.3d at 996–97. Indeed, the principles governing contract interpretation apply with equal force to the interpretation of government issued solicitations. *See Banknote*, 365 F.3d at 1353 n. 4 (citing *Grumman Data Systems*, 88 F.3d at 997–98). Accordingly, the court's starting point is the plain language of the solicitation at issue. *Id.* at 1353. If the solicitation's language is clear and unambiguous, the court must give the language its "plain and ordinary meaning," and may not rely on extrinsic evidence to aid in its interpretation. *Id.* (internal citations omitted); *see also Overstreet Electric*, 59 Fed.Cl. at 112. Further, the court must "consider the solicitation as a whole, interpreting it in a manner that harmonizes and gives reasonable meaning to all of its

provisions." *Banknote,* 365 F.3d at 1353; *Overstreet Electric,* 59 Fed.Cl. at 112 (citing *Fortec Constructors v. United States,* 760 F.2d 1288, 1291 (Fed.Cir.1985)).

Here, Rotech advances a number of arguments to show that RFPs 583 and 247 call overwhelmingly for the supply of products. As a threshold matter, Rotech emphasizes that nothing in the statute implies that the non-manufacturer rule's application depends on a procuring agency's characterization of a procurement. Instead, plaintiff argues, "[t]he relevant issue ... is whether the agency is procuring 'a product,' and not the label affixed by the agency...." Pl.'s Resp. at 10. Turning to the specific provisions of the RFPs, plaintiff argues that both include a "Schedule of Supplies/Services" which demonstrates the solicitations' purpose to procure home oxygen products. Rotech points out that fourteen of the fifteen line items listed in RFP 583 call for the supply of home oxygen products. Only one, Item 0014 ("Delivery for re-supply and/or relocation of equipment due to change in patient's residence") appears to require services. Pl.'s Mot. at 4–5. Rotech underscores the fact that Item 0014 is designated as a "N/C item," which indicates that it contributes nothing to the dollar value of the procurement. Similarly, sixteen of the nineteen items included in RFP 247's schedule describe home oxygen products. *Id.* at 6–7 (citing AR at 12–21).

Rotech argues further that the similarities between the two RFPs is no coincidence, because both are based on a "Solicitation Template" issued by the VA for use by its Network Directors in home oxygen procurements. To bolster that theory, plaintiff quotes an accompanying memorandum written by the VA's Deputy Under Secretary for Health for Management and Operations:

> The following solicitation template was jointly developed by the Prosthetic Clinical Management (PCM) Program Home Oxygen Workgroup and Office of Acquisition and Material Management (OA & MM) for the acquisition of commercial products. This version contains clauses and pricing tables. It is designed for use by the different Veterans Integrated Service Networks (VISN) and VA Medical Centers to meet their individual requirements for Home Oxygen in a uniform fashion—One VA.

*Id.* at 8. Plaintiff notes that the Template includes several clauses applicable to the acquisition of commercial products; the fact that the Memorandum describes the Template as being "developed ... for the acquisition of commercial products"; the fact that the Template "is not designed to meet the needs of a network that also requires a contract for clinical respiratory *service*"; and the fact that the Template lists the one service aspect of the work as a no cost item. *Id.* (quoting AR at 176 and adding emphasis). Rotech states that "[w]hile a VA home oxygen solicitation may involve some incidental services, the incidental nature of services is highlighted by the Solicitation Template's identification of the Schedule's one services item for delivery and relocation of equipment as a ... no charge item[ ]." *Id.* (citing AR at 184–85, 191, 198, 204, 211). Plaintiff acknowledges the government's contention that the Solicitation Template is actually used by the agency to procure both products and services, because the definition of the term "commercial products" includes some accompanying services. Rotech argues, though, that if the term "products" also includes "services," then by the same token the non-manufacturer rule could be construed to apply to procurements for supplies which, in turn, include services. Rotech states that "[t]his reasoning ... would mean that the Rule applies to any procurement for products and/or services, which would provide all the more reason for granting Rotech's motion...." Pl.'s Reply at 13.

Plaintiff also relies on "Government Estimates" included in the administrative record which were prepared by the VA for each of the seven facilities subject to RFP 583. Rotech points out that, for each facility, 100% of the VA's total estimated procurement cost is attributed to the home oxygen products listed in the schedule, whereas none of the value is attributable to the one line item which calls for home oxygen services. Similarly, the proposals from Mitchell and FCC state that [ ]. Both companies bid [ ] for the schedule item which describes services. Pl.'s Mot. at

10 (citing AR at 1078, 1084, 1101, 1108, 1114, 1120, 1126, 1132, 1138, 1144, 1192). Accordingly, Rotech insists that "it is beyond dispute that the overwhelming value (arguably the entire value) of the procurement is for home oxygen products." *Id.* at 11. Rotech acknowledges the government's contention that the cost of each item under the solicitation also implicitly includes the cost of the services that will accompany them, but argues that this "confirms that services are merely incidental to the products being procured by the VA.... When services are so relatively minor that they are being procured without any express price or even a mention in the RFP Schedule, they are by definition incidental to the products which are described in considerable detail in the Schedule." Pl.'s Reply at 12–13.

Next, plaintiff argues that the NAICS codes assigned to RFPs 583 and 247 are irrelevant to whether the procurements describe contracts for supplies or services. Rotech observes that the assignment of NAICS codes is governed by a separate section of the Small Business Act, 15 U.S.C. § 637(a)(17)(B)(ii), and relates to the offeror's *own* small business status, which is not in dispute here. Moreover, plaintiff argues that the sections of the RFPs which discuss the NAICS code system, when examined carefully, actually support Rotech's position that these are procurements for supplies. As plaintiff correctly points out, both RFPs reference the NAICS code assigned by the agency and the accompanying small business size standards, but go on to state that "the small business size standard for a concern which submits an offer in its own name, but proposes to furnish an item which it did not itself manufacture, is 500 employees." Pl.'s Resp. at 4 (citing AR at 48, 364). Rotech insists that "[d]efendant's Motion is fatally flawed because it ignores this critical RFP provision and focuses instead on the NAICS Codes identified on the cover sheets" for each procurement. *Id.* According to plaintiff,

[t]he fundamental problem ... is that NAICS Codes and associated size standards ... do *not* apply in the context of an

offeror which proposed to furnish a product manufactured by a third party (which is precisely when the Nonmanufacturer Rule applies).... [I]n the context where the Nonmanufacturer Rule applies ... both RFP 583 and RFP 247 provide specifically that the applicable size standard "is 500 employees."

*Id.* at 5 (citing AR at 48, 364) (emphasis in original). Rotech posits that, if these were contracts for services, inclusion of this provision—which describes the size standard applicable to contracts for manufactured items—would not have been necessary.[18] Rotech is also careful to emphasize FAR § 12.301(b), which states that the 500 employee small business standard is to be included in "solicitations for the acquisition of commercial items." *Id.* at 7 (quoting 48 C.F.R. § 12.301). Plaintiff claims that "[n]othing in the statute suggests that the size code has any relevance to or effect on whether the offeror must represent that it will supply the product manufactured by a domestic small business." *Id.* at 9. And plaintiff argues that although the NAICS code assigned to RFP 583 is titled "Home Health Equipment Rental," that fact is irrelevant, because the non-manufacturer rule does not distinguish between purchased and rented products. Moreover, Rotech contends, only five of the products listed in the schedules are to be rented, whereas nine are to be purchased.

Rotech also argues that the public policy considerations underlying the non-manufacturer rule lend support for its application to these RFPs. Plaintiff cites the following statement by the SBA:

Without the non-manufacturer rule, large manufacturers could simply supply their products to the government indirectly (through small business offerors that won the contract). Small business would then, in effect, be competing with large manufacturers on a large number of contracts ostensibly reserved for small business.

**18.** Rotech also points out that this alternative size standard is set out in the VA's Template for home oxygen procurements, which the government concedes was used to create RFPs 583 and 247.

Pl.'s Mot. at 15 (quoting Small Business Regulations; Non–Manufacturer Rule, 60 Fed. Reg. 27924, 27925 (May 26, 1995)). Plaintiff argues that "reliance on an agency's characterization of a procurement—rather than the reality of what is being procured—would result in a direct violation of both the statutory language and the underlying policies ... the clearly stated purpose of the Nonmanufacturer Rule is to ensure that small businesses are the real beneficiaries of 'small business' preferences...." *Id.* at 20. To emphasize the point that agencies can, and do, mischaracterize procurements in order to avoid the rule, plaintiff points to a consultant's report included in the administrative record. *Id.* at 21. That report, a "Home Oxygen Contracts Study," refers repeatedly to "home oxygen services," but states that 73% of the VA contracts reviewed in the study called for "Equipment and Oxygen Only." *Id.* (citing AR at 139).

For its part, defendant argues that RFPs 583 and 247 both clearly call for the provision of a significant amount of services. The government notes, for example, that RFP 247 requires contractors to provide a price quote for therapist time per hour, for use in special situations or in conjunction with clinical procedures when a credentialed therapist's services are required. Defendant also insists that the service aspects of the RFPs are not "no cost items," because the RFPs instruct offerors to "[p]rovide firm fixed pricing for the equipment, supplies, *and services* per patient per month for the VA facility...." In addition, they state that "[a]ll Contractor costs associat[ed] with the provision of home oxygen services must be included in the unit price/estimated total cost of the line items included under Schedule of Supplies/Services...." Def.'s Resp. at 13 (quoting AR at 276 and adding emphasis). The solicitations likewise provide that the "price for items listed *includes* delivery, set-up, education, preventive maintenance inspections as specified by the manufacturer...." *Id.* at 14 (quoting AR at 335 and adding emphasis). The United States notes that similar language is found in the VA's Solicitation Template. Defendant argues further that the Template's admitted inapplicability to "clinical respiratory services" is irrelevant here, as

that phrase addresses a completely different sort of procurement which involves treatment within medical facilities. The government also reiterates its claim that the Solicitation Template's inclusion of federal acquisition regulations related to "commercial items" is not evidence that the Template is to be used in procurements for supplies rather than services, because the FAR defines a "commercial item" to include services. *Id.* at 15 (citing 48 C.F.R. § 2.101). Last, defendant argues that the court must take into account the NAICS codes assigned to the RFPs by the VA:

> The VA's classification of both RFP 583 and RFP 247 under service NAICS codes reflects the VA's determination that services constitute an important part of both these procurements. Accordingly, the court should give appropriate consideration to the NAICS codes selected for these procurements.

Def.'s Reply at 23. In conjunction with this statement, the government repeats its contention that, although the language of 48 C.F.R. § 52.212–1 is included in both solicitations, it does not actually apply.

As the briefing summarized above makes clear, the parties agree that RFPs 583 and 247 include some terms which describe supplies, and others which describe services. They disagree, however, on the significance of the "service" clauses, and whether they are prevalent enough to remove the RFPs from the scope of the non-manufacturer rule. A comparison of the terms disputed here with others previously examined by SBA and the courts is helpful to assess their import. Both parties cite to one of the earliest administrative decisions on point, *John R. Bermingham,* which dealt with this issue in some detail. In *John R. Bermingham,* the challenged solicitation called for "a combination of work which could be classified as 'service' and 'supply.'" SBA No. 1889 (1984). Specifically, it required "Class 'B' Overhaul [which] include[d] restorations, parts, replacement and adjustments required to restore the dimensions and clearances to within the tolerances specified in the applicable technical manuals, [d]rawings and plans." *Id.* On review, the SBA noted that several

clauses of the solicitation indicated that the contract being offered was one for supplies. For example, the document identified the manufacturer, the dealer, and the place of performance. On the other hand, the solicitation also included language applicable only to service contracts. The "General Provisions" section stated "DAR REQUIRED CLAUSES FOR FIRS FIXED PRICE SERVICE CONTRACTS." In addition, the procurement had been assigned Standard Industries Classification Code 7699, titled "Repair Shops and Related Services not Elsewhere Classified." After considering these terms, the SBA determined that the contract was one for services, because the awardee would not provide new supplies to the agency, but instead would only refurbish existing ones. *Id.* ("Bermingham would be providing a service to the Department of the Navy by accomplishing the overhaul of Leslie Regulators/Controllers. Leslie would be supplying to Bermingham the end item, the overhauled regulator or controllers ... and not a new item. It is therefore, found that this solicitation is a 'Service' contract....").

Here, as in *John R. Bermingham,* the terms of the RFPs appear to conflict with one another, because they include some terms which apply to supply contracts, and others which apply to service contracts. These RFPs are different, however, because both undoubtedly call for the provision of new home oxygen equipment. Part III of RFP 583, titled "Scope of Contract and Statement of Work," provides that "[a]ll equipment is to be current state-of-art model and all supplies are to be new." AR at 327. Clearly, these are not contracts for refurbishment which can be classified as "services" contracts under the reasoning of *John R. Bermingham.* Accordingly, that decision provides little guidance here.

A comparison with another solicitation reviewed by the SBA in *Best Western Inn-Towne Hotel* is also of little help. The contract reviewed in that decision called for the provision of lodging and meals to armed forces applicants, which is a classic example of a contract for services. SBA No. 2574 (1986). In fact, after that decision, the SBA listed that type of contract in the Federal

Register as an example of a procurement for services. *See* Small Business Size Standards; Revisions; Corrections, 54 Fed.Reg. 35454–01 (Aug. 28, 1989) (stating that "[i]nstitutional food service, computer software and other service-type contracts are excluded from the nonmanufacturer's size standard"). Further, Best Western InnTowne Hotel includes very few factual details which can be compared with the facts of this protest.

In the court's view, the situation presented here most resembles that reviewed in *Arizona Medical Supply,* SBA No. 1295 (1979). There, as here, the solicitation required the proposed awardee to sell new medical equipment to the procuring agency, and to deliver, retrieve, maintain, and store all such equipment, old and new. *Id.* In considering whether the procurement was one for services or supplies, the SBA noted carefully that "[t]he only separate charge identified on the solicitation other than for sale of the equipment is for pickup and delivery." It also emphasized that, according to the agency's contracting officer, "the great proportion of the value was [to be] for the equipment...." *Id.* The SBA concluded that because most of the value of the procurement related to the supply of equipment, and the comparative value of the services was incidental, the procurement was "primarily for the sale of prosthetic equipment." *Id.* The same is true here. As plaintiff has underscored repeatedly, the majority of the line items listed in RFPs 583 and 247 are for manufactured products to be provided to VA patients. Only a handful relate to the provision of services. And, while it may be true that some costs are associated with the provision of those services, but simply are not billed separately, there is no evidence on this record to establish the relative size of those costs, or to show that they are anything more than "incidental." The court appreciates the United States' argument that the cost of servicing each item of manufactured equipment represents a portion of each item's total sale price. There is no evidence, however, to quantify that claim. On this record, the "services" portions of the contracts offered under RFPs 583 and 247 are slight in comparison to the supply portions. For that reason, the court cannot conclude that these

solicitations truly offer mixed-purpose contracts which would disqualify the disputed procurements from being classified as supply contracts.

At this juncture, it is appropriate to note that the SBA's approach in *Arizona Medical Supply*—a comparison of the dollar value of the supply versus services portions of a contract—is echoed in other areas of the law. A parallel can be drawn, for example, between this method of analysis and the SBA regulation which describes the method for determining the size standard applicable to a federal government procurement. Title 13 of the Code of Federal Regulations, section 121.402, provides that size standards are typically assigned to procurements "according to the component which accounts for the greatest percentage of contract value." *Id.* § 121.402(b); *see and compare Advanced Sys. Int'l, Inc.,* SBA No. 3448 (1991) (concluding that a solicitation for training manuals to be used by the military to instruct personnel on use of equipment was a supply contract, because 75 to 80 percent of the value of the contract related to tangible deliverables, whereas 20 to 25 percent was attributable to ancillary services). Similarly, a number of courts have been called on to determine whether a contract is subject to the Service Contract Act or the Walsh–Healy Act, based on whether its "principal purpose" is the furnishing of services though the use of service employees. To do so, the courts undertake a case by case examination of the terms of the contract, and of the work required thereunder, to determine the source of the majority of the contract's value. *See, e.g., Ober United Travel Agency, Inc. v. United States Dep't of Labor,* 135 F.3d 822 (D.C.Cir.1998) (holding that government travel management contracts were service contracts subject to the Service Contract Act, rather than supply contracts, because their principal purpose was to procure assistance in booking travel, but they did not actually obligate the government to purchase any products); *Donovan,* 757 F.2d at 345 (deferring to Secretary of Labor's determination that contracts for sale of timber were supply contracts, despite ancillary services which were to be performed in order to harvest timber); *see also McLucas,* 364 F.Supp. at 771. A similar approach can even be found in state law jurisprudence focused on the application of the Uniform Commercial Code to "non-divisible mixed (goods and services) contracts." *Bonebrake v. Cox,* 499 F.2d 951, 960 (8th Cir.1974) (internal quotations omitted); *Conopco, Inc. v. McCreadie,* 826 F.Supp. 855, 867–68 (D.N.J.1993) ("In considering whether the U.C.C. will apply to a mixed goods and services contract, the court must determine whether goods or services predominate.").

Inasmuch as this common sense approach to classification appears in relevant SBA decisions, the federal regulations, and elsewhere in state and federal law, the court concludes that it should govern this analysis as well. Applying that test to the facts of this case, it is clear that RFPs 583 and 247 include only an incidental amount of services. The VA's own estimate of proposal costs related to RFP 583 indicates that the single service requirement listed in the schedule, Item 0014, will account for [ ] of the entire cost of the procurement in all of the areas in which small business set-aside awards are planned. *See* AR at 2020–26. The cost of supplies is vastly larger. In Area B, for example, the equipment and supplies will cost the government approximately [ ]. *Id.* at 2021. In Area C, they will cost approximately [ ]. *Id.* at 2022. In Area F, they will cost approximately [ ], and in Area G, they will cost approximately [ ]. *Id.* at 2025–26. Based on these figures, it is clear that RFP 583 offers contracts which are almost entirely, if not exclusively, for supplies, to which the non-manufacturer rule undoubtedly applies. There is no reason to conclude that the outcome regarding RFP 247 will differ in any significant way.

In addition, the court rejects the contention that the NAICS codes chosen for these procurements are dispositive of whether they are ones for supplies or services. The code chosen by an agency's contracting officer is certainly one item of evidence which may be examined by the court in determining the nature of a particular procurement, and thus, whether it is subject to the non-manufacturer rule. There is no support, however, for the contention that the label assigned to a pro-

curement in fact determines the nature of the contract to be awarded thereunder. The United States appears to argue that because the NAICS codes assigned to RFPs 583 and 247 are ones used to describe service contracts, and because the regulations required the VA's contracting officers to choose codes which accurately represented the nature of the proposed contracts, it follows that the contracts are undoubtedly ones for services. Unfortunately, that logic fails to account for the very real possibility that an NAICS code could be assigned in error. That possibility is especially relevant here, where the plain language of RFPs 583 and 247 appears to contradict the CO's choice. Again, the solicitations themselves show that the value of the contracts is mostly, if not entirely, attributable to the portion which calls for the supply of manufactured products.

For these reasons, the court concludes that RFPs 583 and 247 offer contracts for supplies. There is no question, then, that the statutory non-manufacturer rule, found at 15 U.S.C. § 637(a)(17), applies to them. Accordingly, the VA's decision to award small business set-aside contracts under RFP 583 to Mitchell and FCC, without considering whether those offerors would provide items manufactured by small businesses, was erroneous. The VA's stated intent to award work under RFP 247 without considering compliance with the non-manufacturer rule is likewise contrary to law. On this record, the court agrees with plaintiff that Rotech was prejudiced by this error in the procurement process, and that but for the error, Rotech would have had a substantial chance to win these awards.

## IV. Relief

 Because Rotech has succeeded on the merits of its claims, the court must now consider the other factors relevant to whether permanent injunctive relief in its favor is appropriate. These factors include whether plaintiff will suffer irreparable harm if the court withholds the requested relief; whether the balance of hardships to the parties favors injunctive relief; and whether it is in the public interest to grant injunctive relief. *PGBA,* 389 F.3d at 1229. To show that it

will suffer irreparable injury if the VA is permitted to proceed with these procurements without applying the non-manufacturer rule, Rotech argues that this approach will effectively exclude it from consideration for award. Plaintiff contends that because it is a successful incumbent contractor, and because its proposal on RFP 583 initially received favorable reviews from the VA, Rotech has a real opportunity to win the contracts offered under RFPs 583 and 247. Pl.'s Mot. at 26–27. Plaintiff cites several decisions from this court which hold that a lost opportunity to compete constitutes irreparable harm. *Id.* at 27 (citing *PGBA, LLC v. United States,* 57 Fed.Cl. 655, 664 (2003); *Overstreet Elec. Co. v. United States,* 47 Fed.Cl. 728, 744 (2000); *United Int'l Investigative Servs., Inc. v. United States,* 41 Fed.Cl. 312, 323 (1998)). Rotech also contends that it has no other adequate remedy, as it may not recover profits for a procurement contract which "never actually came into existence." *Id.* at 28 (citing *Keco Indus., Inc. v. United States,* 192 Ct.Cl. 773, 428 F.2d 1233, 1240 (1970)). Next, plaintiff argues that to grant injunctive relief here is in the public interest because "the public interest in honest, open, and fair competition in the procurement process is compromised whenever an agency abuses its discretion in evaluating a contractor's bid." *Id.* at 28 (quoting *PGBA,* 57 Fed.Cl. at 663). Rotech also notes that the public interest will be served by the proper application of the non-manufacturer rule, which embodies an important public policy to ensure that small business manufacturers actually benefit from small business set-asides. *Id.* at 29. Rotech argues further that the balance of harms lays clearly in its favor, because the United States has no interest in violating the non-manufacturer statute. *Id.* at 30. Plaintiff states that "in the event that the VA were to assert some form of harm, the express Congressional language to the contrary represents a determination that this interest is outweighed by the need to ensure that the small business program primarily benefits small business manufacturers." *Id.*

The United States has presented no argument regarding the other factors relevant to the propriety of permanent injunctive relief. Indeed, defendant apparently concedes that,

if Rotech is successful on the merits of its claim, the most appropriate resolution is for the VA to conduct a resolicitation for areas B, C, F and G under RFP 583 in a manner consistent with the non-manufacturer rule, and to apply the non-manufacturer rule to proposals under RFP 247. The court likewise agrees with plaintiff that, based on each of the relevant factors, a permanent injunction is warranted. There is no question that "[t]he public has a strong interest in insuring that public officials treat contractors fairly and generally obey procurement laws and regulations." *Transatlantic Lines LLC v. United States,* 68 Fed.Cl. 48, 57 (2005); *see also CW Gov't Travel, Inc. v. United States,* 61 Fed.Cl. 559, 578 (2004) (describing "an overriding public interest in preserving the integrity of the federal procurement process by requiring Government officials to follow procurement statutes and regulations"); *Alfa Laval Separation, Inc. v. United States,* 40 Fed.Cl. 215, 235 (1998) (stating that "the public has a strong interest in assuring that the integrity of the procurement laws are preserved—both in letter and spirit"). Because the procurement approach adopted by the VA in this instance violates the letter and the spirit of the non-manufacturer rule and the Small Business Act as a whole, it cannot be upheld. A permanent injunction in favor of plaintiff is therefore appropriate. Accordingly, the court grants Rotech's cross-motion for judgment on the administrative record, and denies the cross-motion for judgment on the administrative record by the United States.

## CONCLUSION

For the foregoing reasons, it is hereby **ORDERED** as follows:

(1) Defendant's Motion for Judgment on the Administrative Record, filed May 19, 2006, is **DENIED;**

(2) Plaintiff's Motion for Judgment on the Administrative Record, filed May 19, 2006, is **GRANTED.** Plaintiff's request for a permanent injunction and declaratory relief is **GRANTED** as follows:

(a) the United States Department of Veterans Affairs, its officers, agents, servants, employees, and representatives and all persons acting in concert and participating with them respecting subject procurement be and they are hereby **PERMANENTLY RESTRAINED AND ENJOINED** from proceeding with awards under Request for Proposals 583–00035–06 and Request for Proposals 247–0082–06 in a manner inconsistent with the requirements of the Small Business Act and the statutory non-manufacturer rule, 15 U.S.C. § 637(a)(17) (2000).

(b) If the United States Department of Veterans Affairs elects to cancel Request for Proposals 583–00035–06 or Request for Proposals 247–0082–06 and to resolicit proposals for the work described therein, the government must do so in a manner consistent with the requirements of the Small Business Act and the statutory non-manufacturer rule, 15 U.S.C. § 637(a)(17) (2000).

(3) The Clerk's Office is directed to **ENTER** judgment in favor of plaintiff;

(4) Each party shall bear its own costs; and

(5) On or before **July 31, 2006,** counsel for each party shall file with the Clerk's Office a redacted copy of this opinion, with any material deemed proprietary marked out in brackets, so that a copy of the Opinion can then be prepared and made available in the public record on this matter.